**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CHANEL HALL, *individually and as* | § | |
| *next friend and personal representative* | § | |
| *of the estate of J.C.P.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2611 |
| | § | |
| SCOTT DIXON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Chanel Hall sued various participants in Texas's child welfare system, alleging that they failed in their duties to her and her daughter, J.C.P., leading to J.C.P.'s death. Her allegations are set out in a sixty-seven page complaint with seventeen counts and numerous attachments. She seeks an unspecified amount of compensatory and punitive damages and declaratory and injunctive relief. The causes of actions can be broken down into the following categories: (1) federal claims asserted under 42 U.S.C. § 1983; (2) claims under the Texas constitution; and (3) claims under Texas statutory and common law. The pending motions seek dismissal or summary judgment on various grounds, including standing, immunity, and failure to state a claim under Rule 12(b)(6).

The events behind these motions are tragic. J.C.P. was born in June 2007, prematurely. Her fragile condition required her to be transferred to Memorial Hermann Hospital shortly after her birth. Doctors there intubated her. In October 2007, doctors at Memorial Hermann recommended a tracheostomy. Hall insisted on a second opinion from outside the hospital before agreeing to the procedure. She alleges in this suit that her insurer, Community Health Choice, would not pay for

the second opinion, delaying her ability to obtain it.  The delay and her continued refusal to consent to the operation resulted in the hospital reporting her to the Texas Department of Family and Protective Services (TDFPS), which took temporary custody of J.C.P. and allowed the hospital to perform the procedure.

TDFPS returned J.C.P. to Hall, who took her home in June 2008.  J.C.P. depended on an oxygen tank and a tracheal tube to breathe.  On August 4, J.C.P. was badly burned when Hall gave her a bath.  TDFPS again took J.C.P. from Hall's custody and placed the child in temporary foster care.  While she was in foster care, J.C.P.'s tube became disconnected and the child asphyxiated. She died in July 2009.

Later that same month, Hall filed suit in state court in Harris County.  The defendants removed to this court shortly thereafter.  The defendants are:  TDFPS and seven of its employees; Memorial Hermann Hospital; Hall's insurer, Community Health Choice; two Texas Supreme Court justices; the organization appointed to provide guardian *ad litem* services to J.C.P., and one of its employees; Harris County and Harris County Child Protective Services (CPS); the foster parent caring for J.C.P. when she died; and the agency that arranged for the foster-care placement.  All the defendants except the foster parent have filed dispositive motions, either to dismiss or for summary judgment.

Based on the pleadings, the motions and responses, the record, and the applicable law, this court grants the dispositive motions, as set out below.  Some of the motions to dismiss are granted with leave to amend, and some are with prejudice.  The specific dispositions and the reasons are explained in detail.

2

# I.     Background

## A.     The Amended Complaint

### 1.     The Allegations

J.C.P., Hall's fifth child and first daughter, was born prematurely on June 27, 2007.  (Docket Entry No. 22, ¶ 78).  Soon after her birth, J.C.P. was transferred to Memorial Hermann Hospital, where doctors intubated her to help her breathe.  (*Id.*, ¶ 92).   In October 2007, Dr. Bloss from Memorial Hermann contacted Hall, telling her that J.C.P. was very sick and likely to die.  (*Id.*, ¶ 79).  A resident later called asking Hall to consent to a tracheostomy on J.C.P.  Hall alleges that Dr. Bloss disagreed with this approach.  (*Id.*, ¶ 79–80).   When the resident called again, Hall refused to consent, believing that J.C.P. was too ill to undergo the procedure.  (*Id.*, ¶ 82).  J.C.P.'s condition began to improve.  (*Id.*, ¶ 83).  After a month, Hall was again asked for her permission to have the tracheostomy performed.  She asked for a second opinion, hoping that the delay would allow J.C.P.'s condition to continue to improve.  (*Id.*, ¶ 86).  Hall alleges that initially she was promised help in obtaining a second opinion and was then told that a second opinion was not possible.  (*Id.*).  She alleges that one doctor, Dr. Berelli, "mocked her," saying she could not get a second opinion because she could not afford one.  (*Id.*, ¶ 87).

Eventually, Hall met with several doctors.  She alleges that they told her the benefits of the tracheostomy procedure but could not recall precisely why J.C.P. needed it.  (*Id.*, ¶ 90).  In late November 2007, Dr. Edmonds, who had attended the meeting, examined J.C.P. and told Hall that the tracheostomy was the right approach.  (*Id.*, ¶ 91).  Hall asked why J.C.P. could not remain intubated; she alleges that Dr. Edmonds responded that intubation would require the child to remain

3

hospitalized for an indefinite period.  She also alleges that Dr. Edmonds told her that she did not need to decide immediately.  (*Id.*, ¶ 92–93).

The same evening, Dr. Berelli called her and angrily demanded to know why she had not consented to the procedure.  (*Id.*, ¶ 94).  She responded that she was thinking about it, would let him know when she decided what to do, thanked him, and hung up.  (*Id.*).  Dr. Berelli called back, told Hall not to hang up on him, and threatened to report her to TDFPS.  (*Id.*).  Stressed, she told him that he could do whatever he wanted to do.  (*Id.*).

Hall alleges that over the next few weeks, she talked to her insurer, Community Health Choice, about getting a second opinion outside Memorial Hermann on whether J.C.P. should have the tracheostomy.  (*Id.*, ¶ 96).  She alleges that besides the insurance company, Memorial Hermann contributed to the delay in her decision about the tracheostomy.  Hall alleges that Memorial Hermann refused to provide a letter authorizing a higher level of care, which Community Health Choice required before allowing the transfer necessary to obtain the second opinion Hall wanted.  (*Id.*, ¶ 99).  Hall alleges that Memorial Hermann's primary concern was how the transfer would be paid for.  (*Id.*, ¶ 100).

Near the end of December 2007, two TDFPS employees, Donatto and Halsey, were assigned to J.C.P.'s case.  (*Id.*, ¶ 110).  Hall alleges that they made no effort to gather information from doctors or experts at other hospitals or from TDFPS and that they failed to investigate her conversations with Dr. Berrelli.  (*Id.*, ¶ 111).  Around January 8, 2008, Donatto, the TDFPS employee, contacted Hall for the first time to talk about her interactions with the doctors at Memorial Hermann.  (*Id.*, ¶ 101).  Hall described her trouble in getting a second opinion outside the hospital.  She alleges that Donatto made two commitments: first, to go to the hospital the next day

to advocate for a second opinion on whether J.C.P. should have the tracheostomy; and second, to talk with Hall at her home afterward.  (*Id.*, ¶¶ 102–03).  Hall alleges that Donatto did not meet with her as promised.  (*Id.*, ¶ 103).  On January 11, 2008, Dr. Morris from Memorial Hermann called Hall to tell her in a "smart and sassy tone" that "[w]e're taking your baby."  (*Id.*, ¶ 104).  Hall called Donatto, who informed her that there would be an emergency hearing on custody of J.C.P. on Monday, January 14.  (*Id.*, ¶ 105).

At the hearing, doctors from Memorial Hermann testified about J.C.P.'s medical condition. Hall alleges that they omitted information on how they had treated her and on the stress their treatment and the situation caused her to suffer.  (*Id.*, ¶ 107–10).  In an affidavit presented at the hearing, Dr. Morris stated that if J.C.P.'s breathing tube came out, she would die if it was not promptly replaced.  (*Id.*, ¶ 119).  At the end of the hearing, the judge gave temporary managing conservatorship to TDFPS.  (*Id.*, ¶ 117).  Memorial Hermann doctors performed the tracheostomy on J.C.P.  (*See id.*, ¶ 127).

Hall alleges that after the emergency hearing, TDFPS employees made "unannounced and intrusive visits" and required her to submit to a mental-health examination and to take parenting classes, even though there was no evidence of mental or parenting problems.  (*Id.*, ¶ 123).  She alleges that she did her best to meet their demands.  (*Id.*, ¶ 124).

J.C.P. returned to Hall's care in June 2008.  Hall alleges that J.C.P. was accidentally injured soon afterward, receiving burns.  Hall took J.C.P. to the emergency room and she was hospitalized. (*Id.*, ¶ 129).  TDFPS took custody of J.C.P. again on August 1, 2008.

Hall alleges that her relatives sought custody of J.C.P. but TDFPS told them that they were not fit to care for the child.  (*Id.*, ¶ 130).  TDFPS filled out a "Kinship Caregiver Home Assessment"

on Hall's niece, Nefertitti Rhodes, who applied to be a temporary placement for J.C.P. (*Id.*, ¶ 131). According to Hall, the report praised Rhodes's love for J.C.P. but did not recommend the placement because Rhodes worked full-time and would have to put J.C.P. in day care. (*Id.*). Hall alleges that no one from TDFPS contacted Rhodes to try to find a way to overcome this problem. (*Id.*). Hall alleges that the same report "falsely" claimed that TDFPS employees contacted Amira Jackmon, another relative. The report incorrectly described Jackmon and Hall as cousins; in fact, they are sisters. (*Id.*, ¶ 132). Hall alleges that TDFPS employees also failed to investigate whether Barbara Hall Ates, Hall's aunt, who lived in California and was a former licensed emergency foster care provider in that state, could serve as a placement for J.C.P. (*Id.*, ¶ 133). Hall alleges that when Ates spoke to TDFPS employees, she volunteered to renew her certification. (*Id.*). Hall alleges that it was not until 2009 that TDFPS investigated whether Hall's niece, Tassandra Allen, could be a placement for J.C.P. Allen was approved as a caregiver, but not until it was too late. (*Id.*, ¶ 134).

Instead of placing J.C.P. with a family member, in 2008, TDFPS contracted with Lutheran Social Services of the South to place the child in a foster home. (*Id.*, ¶ 136). Lutheran Social Services chose Joanie Cochran, a licensed vocational nurse. Hall alleges that TDFPS; its employees; the attorney *ad litem* appointed by the 315th District Court in Harris County, Harry W. Rhodes III; and Betsi Sanchez, the advocacy coordinator of Child Advocates, Inc., which was appointed as J.C.P.'s guardian *ad litem*, all knew or should have known that Cochran worked outside the home and would not be able to provide constant attention to J.C.P. (*Id.*, ¶137). Hall alleges that Cochran often took J.C.P. out without necessary medical equipment, including her oxygen tank and the monitor that made a loud noise if J.C.P.'s tube detached. (*Id.*, ¶ 138). Hall alleges that she told TDFPS employee Smith of these lapses, but Smith brushed her off. (*Id.*, ¶ 139).

Around May 12, 2009, Dr. Edmonds met with Hall and two of her nieces; TDFPS employee Smith; Cochran and her niece; and representatives of Child Advocates, to talk about scar tissue that had formed at the insertion point for J.C.P.'s tracheostomy tube. (*Id.*, ¶ 139). Warning that the scar tissue could make it difficult to replace the tube if it became detached, Dr. Edmonds advised removing the scar tissue. (*Id.*). Dr. Edmonds said any surgery should wait, due to J.C.P.'s malnutrition. (*Id.*). Two months later, neither Cochran, Smith, Rhodes, nor Sanchez had taken steps toward scheduling the surgery or alerting the court to the lack of progress, and had not pursued the cause of J.C.P.'s malnourishment. During this time, Nefertitti Rhodes repeatedly asked Smith whether J.C.P. was getting physical therapy to walk, but Smith never responded. (*Id.*, ¶ 144).

About midway through 2009, TDFPS sought to terminate Hall's parental rights. (*See Id.*, ¶ 146). Hall chose to mediate instead of going to trial and reached a settlement on June 23. (*Id.*). At the July 8 settlement hearing before the judge, Rhodes called witnesses to testify to J.C.P.'s interests. (*See Id.*, ¶ 146–47). Hall's attorney was not allowed to address the court. A doctor at HealthBridge Hospital, where J.C.P. had been hospitalized after her burns, testified that she should not be admitted to the hospital. (*Id.*). The judge agreed, left J.C.P. in foster care, and confirmed the settlement. (*Id.*, ¶ 146–47).

J.C.P. died on July 12, 2009, at Cochran's home. (*Id.*, ¶ 149). J.C.P. asphyxiated after the tracheostomy tube disconnected. (*Id.*). Hall alleges that Cochran was doing paperwork instead of watching the child and did not know how the tube disconnected. (*Id.*). On August 14, TDFPS cited Lutheran Social Services for a violation of Rule No. 749.2593(a)(5), which requires caregivers to refrain from performing tasks that "clearly impede the caregiver's ability to supervise and interact with the children." (*Id.*, ¶ 149). TDFPS ordered an autopsy after Hall insisted. (*Id.*, ¶ 150). Hall

alleges that after TDFPS prevented her from having an independent pathologist examine J.C.P., she obtained an injunction giving her access to J.C.P.'s body. (*Id.*, ¶ 150–52). Hall alleges that TDFPS did not reimburse the funeral expenses, apologize, or express condolences. (*Id.*, ¶ 153).

On July 15, 2009, TDFPS was named J.C.P.'s permanent managing conservator. Hall received possessory rights. Her parental rights were not terminated. (*Id.*, ¶ 154). Hall appealed the decree. Harris County moved for dismissal on the basis of J.C.P.'s death. (*Id.*, ¶ 155). Hall filed this suit in state court on July 20, 2009, and the defendants removed.

### 2.    The Parties

The defendants are:

- TDFPS and eight of its employees: the deputy commissioner, Joyce James; the employee who investigated the December 2007 neglect report, Cyntera Donatto, and her supervisor, Terri Halsey; the care worker assigned to J.C.P. after the initial investigation, Keith Lasco; the care worker assigned after that incident, Lasandra Smith; the supervisor who approved J.C.P.'s child service plan and decided Nefertitti Rhodes should not be J.C.P's caregiver, Sheila Hazley; the employee who allegedly refused to communicate with Hall after J.C.P.'s death, Tonya Clay, and her supervisor, Scott Dixon, who allegedly failed to reprimand her. All these defendants are sued in their individual capacities except James, who is named in her individual and official capacities.

- Memorial Hermann, the hospital whose doctors reported Hall for neglect.

- Community Health Choice, Hall's insurance company, which refused to pay for a second opinion outside Memorial Hermann.

- J.C.P.'s guardian *ad litem*, Child Advocates, Inc., and its advocacy coordinator, Betsy Sanchez.

- Joanie Cochran, the foster mother.

- Lutheran Social Services of the South, Inc., which placed J.C.P. with Cochran.

- Harry W. Rhodes, III, the attorney *ad litem*.

- Texas Supreme Court Chief Justice Wallace B. Jefferson and former Supreme Court Justice Harriett O'Neill, sued in their official capacities.

### 3.    The Causes of Action and Requested Relief

The complaint contains seventeen counts.  Some allege harm to Hall, some to J.C.P., and some to both.

- In Count I, Hall alleges that Memorial Hermann is liable for common-law negligence and medical malpractice under TEX. PRAC. & REM. CODE § 74.001 *et seq.*  She alleges breach of these duties in three ways: (1) by giving her confusing advice and not offering a "timely method of resolving her dispute with the hospital;" (2) by harassing and threatening her; and (3) by making a "false report of medical neglect to TDFPS."  (*Id.*, ¶¶ 158–60).  Hall alleges that the conduct caused her "anger, anxiety, and [a] sense of helplessness," and that the actions were malicious and reckless.  (*Id.* at ¶¶ 161–62).

- Count II alleges that Community Health Choice, the insurer, was negligent under Texas common law and violated the Texas medical malpractice statute, TEX. CIV. PRAC. & REM. CODE § 88.002, causing damages to Hall.

9

- Count III alleges that Hall's due process rights under Article I, § 19 of the Texas Constitution were violated by Memorial Hermann; James, the TDFPS deputy commissioner; TDFPS employees Dixon, Donatto, and Halsey; and Harris County CPS.   Hall alleges that these state actors worked together to create a policy "inconsistent with the exercise of reasonable professional judgment" and were "deliberate[ly] indifferen[t] to the serious and constitutionally protected rights of Hall."   (Docket Entry No. 22 ¶ 168).   Memorial Hermann allegedly "use[d] state created procedures to make the false report and act[ed] in concert with TDFPS to deprive Hall of her right to direct [J.C.P.'s] health care decisions."   (*Id.*).   Paragraph 169 lists eleven different rights Hall alleges are protected by this provision of the Texas Constitution: "(1) the right to have physical possession, to direct the moral and religious training, and to designate the residence of the child; (2) the duty of care, control, protection, and reasonable discipline of the child; (3) the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education; (4) the duty, except when a guardian of the child's estate has been appointed, to manage the estate of the child, including the right as an agent of the child to act in relation to the child's estate if the child's action is required by a state, the United States, or a foreign government; (5) the right to the services and earnings of the child; (6) the right to consent to the child's marriage, enlistment in the armed forces of the United States, medical and dental care, and psychiatric, psychological, and surgical treatment; (7) the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the

child; (8) the right to receive and give receipt for payments for the support of the child and to hold or disburse funds for the benefit of the child; (9) the right to inherit from and through the child; (10) the right to make decisions concerning the child's education; and (11) any other right or duty existing between a parent and child by virtue of law."

- In Count IV, Hall, on behalf of herself and as next friend of J.C.P., alleges violations of the First, Ninth, and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983 by Memorial Hermann; James, the TDFPS deputy commissioner; TDFPS employees Dixon, Donatto, and Halsey; and Harris County CPS. These causes of action rest on the same theory as those set forth in Count III, depriving Hall and J.C.P. of their parent-child and parent-sibling relationships.

- Count V alleges violations of the Fourteenth Amendment under § 1983 by Chief Justice Jefferson and former Justice O'Neill and Harris County, on the basis that their actions deprived Hall and J.C.P. of a meaningful opportunity to be heard, in violation of their due process rights.

- Count VI concerns the same defendants and actions as Count V, but it alleges deprivation of J.C.P.'s state-law right to effective representation, in violation of Article I, § 19, of the Texas Constitution and TEX. FAM. CODE. § 107.012. Count VI also alleges deprivation of J.C.P.'s right to effective counsel under the Fourteenth Amendment to the United States Constitution and the Child Welfare Act, 42 U.S.C. § 670 et seq.

11

- Count VII alleges substantive due process violations of the Article I, § 19 of the Texas constitution that harmed J.C.P.  The allegations are against James, the TDFPS deputy commissioner; Dixon, Halsey, Lasco, and Smith, TDFPS employees; Harris County CPS; Child Advocates and Sanchez, its advocacy coordinator; and Rhodes, the attorney *ad litem* appointed for J.C.P.  Count VII alleges that they failed in their "affirmative duty to protect" J.C.P. from the constitutional violations leading to her death.

- Count VIII alleges that the same defendants' actions violated J.C.P.'s due process rights, as protected by the Fourteenth Amendment to the United States Constitution.

- Count IX alleges violations of the Federal Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 622, 671, 675 and 45 C.F.R. § 1355.20.

- Count X alleges that the TDFPS employees, Harris County CPS, and Lutheran Social Services deprived J.C.P. of her rights to a properly screened and supervised foster home under TEX. HUM. RES. CODE § 42.042 by failing to throughly investigate. Count X also alleges that they failed properly to supervise Cochran, in violation of TEX. FAM. CODE § 264.106(b).

- Count XI alleges that the TDPS employees; Child Advocates and its advocacy coordinator, Sanchez; and Rhodes, the attorney *ad litem,* failed to protect J.C.P.'s right to a safe environment under TEX. FAM. CODE § 264.1071.

- Count XII alleges that the TDFPS employees denied J.C.P. the benefits of the Early and Periodic Screening, Diagnosis and Treatment program under Medicare, in violation of § 1983.

- Count XIII alleges that TDFPS breached its duties under Titles IV-B, IV-E, and XIX of the Social Security Act by violating unspecified regulations of the Department of Health and Human Services, causing harm to J.C.P.

- Count XIV alleges that Rhodes, the attorney *ad litem,* failed to honor the terms of the mediated settlement agreement, causing harm to J.C.P.

- Count XV alleges that Lutheran Social Services breached its contractual obligations with TDFPS, causing harm to J.C.P., an intended third-party beneficiary of the contract.

- Count XVI alleges violations of J.C.P.'s rights under the Child Welfare Act and the Early Periodic Screening and Diagnostic Treatment (EPSDT) provisions of the Medicaid Act and TEX. FAM. CODE Chs. 263–66 by James, Dixon, Donatto, Halsey, Lasco, Smith, and Harris County CPS.

- Count XVII asserts a wrongful death claim under Texas common law against TDFPS, Clay; Dixon; Harris County CPS, Child Advocates and its advocacy coordinator, Sanchez; Rhodes; Lutheran Social Services; and Cochran.

Hall seeks injunctive relief against James, Harris County, Harris County CPS, Child Advocates, and Texas Supreme Court Chief Justice Jefferson and former Justice O'Neill. She also seeks damages against all of the defendants except Justices Jefferson and O'Neill. She also seeks declaratory relief.

### B.    The Motions

After Hall filed her amended complaint, all parties except Cochran filed dispositive motions.

13

The following motions are pending:[1]

- Chief Justice Jefferson and Justice O'Neill moved to dismiss on standing and immunity grounds. (Docket Entry No. 40).  Hall filed a response and an amended response, (Docket Entry No. 60, 98).  The justices replied, (Docket Entry No. 102).

- TDFPS and its employees have moved to dismiss, (Docket Entry No. 46), and for summary judgment, (Docket Entry No. 63), amended primarily to fix typographical errors, (Docket Entries No. 72, 74).  Hall responded to the motion to dismiss, (Docket Entry No. 59), and to the motion for summary judgment, (Docket Entry No. 75).

- Community Health Choice moved to dismiss under Rule 8(d)(1) or alternatively to strike "immaterial statements," (Docket Entry No. 38).  Hall responded, (Docket Entry No. 61).  Community Health Choice also moved to dismiss under Rule 12(b)(6), (Docket Entry No. 39, 43), to which Hall filed a response, (Docket Entry No. 58), and Community Health Choice replied, (Docket Entry No. 81).  Community Health Choice filed another motion to dismiss based on immunity under federal and state law, (Docket Entry No. 57), to which Hall responded, (Docket Entry No. 77).  After this court gave Hall leave to file an amended complaint and a brief, she filed a memorandum outlining a new theory of liability, (Docket Entry No. 105), to which Community Health Choice replied, (Docket Entry No. 108).

- Rhodes has filed a motion to dismiss, relying on immunity, among other grounds. (Docket Entry No. 67).  In response to an order entered at a conference, Hall filed

---

[1]   In addition, Hall has filed a motion to compel discovery.  (Docket Entry No. 125).  The motion is denied as moot.

an amended complaint and brief, (Docket Entries Nos. 110, 111), to which Rhodes
has replied, (Docket Entry No. 117).[2]

- Lutheran Social Services has moved to dismiss.  (Docket Entry No. 68).  Hall has
  responded, (Docket Entry No. 92), and Lutheran Social Services has replied, (Docket
  Entry No. 97).

- Harris County and Harris County CPS have moved to dismiss.  (Docket Entry No.
  56).  Hall has responded, requesting discovery, (Docket Entry No. 76), and Harris
  County and Harris County CPS have replied, disputing the need for discovery,
  (Docket Entry No. 83).

- Child Advocates and Sanchez have moved to dismiss, (Docket Entry No. 65), to
  which Hall responded by requesting discovery, (Docket Entry No. 80).

- The parties have moved for a status conference.  (Docket Entry No. 124).

Based on the pleadings, the parties' submissions, and the applicable law, this memorandum
and opinion resolves the pending motions, as follows:

- The motion to dismiss filed by Chief Justice Jefferson and Justice O'Neill, (Docket
  Entry No. 40), is granted.  Because Hall lacks standing to assert the only relief she
  has pleaded against them, the motion to dismiss is with prejudice and without leave
  to amend.

---

[2]   At the February 8, 2010 hearing, this court ordered Hall to file her amended complaint and brief by March
28.  (Docket Entry No. 82).  Along with her memorandum and amended complaint, which she filed on May
10, Hall filed a motion for leave to file out of time.  (Docket Entry No. 109).  Rhodes opposed this motion,
arguing that the delay prejudiced him by causing him to expend further resources to defend.  (Docket Entry
No. 113).  Hall's motion to file out of time is granted.

- The amended motion for summary judgment filed by TDFPS and its employees (Docket Entry No. 72), is granted.  The claims against the TDFPS parties are dismissed with prejudice.  The motion to dismiss, (Docket Entry No. 46), is denied as moot.

- The motion to dismiss filed by Community Health Choice based on immunity, (Docket Entry No. 57), is granted.  Its other motions to dismiss, (Docket Entries No. 38, 43), are denied as moot.

- The motion to dismiss filed by Rhodes, (Docket Entry No. 67), is granted.

- The motion to dismiss filed by Lutheran Social Services, (Docket Entry No. 68), is granted.

- The motion to dismiss filed by Harris County and Harris County CPS, (Docket Entry No. 56), is granted.

- The motion to dismiss filed by Child Advocates and Sanchez, (Docket Entry No. 65), is granted.

- The joint motion for a status conference, (Docket Entry No. 124), is granted.  A status conference is set for **November 12, 2010**, at 2:00 p.m. in Courtroom 11-B.

The reasons for these rulings are set out below.

## II.     The Motions Challenging Subject-Matter Jurisdiction

### A.     The Applicable Legal Standards

Federal courts are "courts of limited jurisdiction."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Whether a court has jurisdiction is a question the court "is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to

16

it." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) (quoting *Great. S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)).

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction.  "A case is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).  "Courts may dismiss for lack of subject-matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cnty.*, 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).  The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1) that does not implicate the merits of plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)); *see also Clark*, 798 F.2d at 741.  Accordingly, the court may consider matters outside the pleadings, such as testimony and affidavits. *See Garcia*, 104 F.3d at 1261.

### B.       Standing

One aspect of subject-matter jurisdiction is standing.  A federal court may only hear "cases and controversies."  U.S. CONST. art. III, § 2.  The irreducible constitutional minimum of standing contains three elements: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury."  *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 405 U.S. 555, 560 (1992)).  As "the party invoking federal jurisdiction," Hall "bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.  She must meet this burden "'with the manner and degree of evidence required at the successive stages of the litigation,'" which means that "on a motion to dismiss, [she] must allege facts that give rise to a plausible claim of . . . standing."  *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 133–34 (5th Cir. 2009) (quoting *Lujan*, 504 U.S. at 561).  When a complaint seeks multiple kinds of relief, the plaintiff must show standing "for each type of relief sought."  *Summers v. Earth Island Inst.*, 129 S.Ct. 1142, 1149 (2009) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

### 1.       Hall's Standing to Assert Claims on Behalf of J.C.P.'s Estate

The *ad litem* defendants—Rhodes, Child Advocates, and Sanchez—move to dismiss on the basis that Hall lacks standing to bring suit on behalf of J.C.P.'s estate, because she lost the right to sue on J.C.P.'s behalf.  On July 15, 2009, TDFPS became J.C.P.'s sole managing conservator and received the "right to represent the child in legal action and to make other decisions of substantial legal significance."  (Docket Entry No. 65, Ex. H ¶¶ 9.2,  11.8).  Hall brings this action individually

and as next friend and personal representative of the estate of" J.C.P.  The *ad litem* defendants
challenge only Hall's standing to sue on behalf of J.C.P.'s estate.

In a survival action, a representative brings claims on behalf of a decedent's estate.  *Russell
v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992).  "The actionable wrong is that which the
decedent suffered before . . . death."  *Id.*  "A change in the status of the party authorized to assert
the decedent's personal injury claim . . . does not change the fact that the decedent has been
personally aggrieved and would not, therefore, eliminate the decedent's justiciable interest in the
controversy.  Because a decedent's survival claim becomes part of her estate at death, it follows that
the estate retains a justiciable interest in the survival claim."  *Austin Nursing Ctr. v. Lovato*, 171
S.W.3d 845, 850 (Tex. 2005).

The *ad litem* defendants' standing objection is a "prudential limitation that constitutes an
objection to the real party in interest under FED. R. CIV. P. 17(a).  Because the Federal Rules of Civil
Procedure address this prudential standing requirement, they govern our inquiry."  *Ensley v. Cody
Res. Inc.*, 171 F.3d 315, 320 (5th Cir. 1999) (footnotes omitted).  Under Rule 17, capacity to sue as
a representative of a decedent is determined under the laws of the state in which the federal district
court sits.  *See* FED. R. CIV. P. 17(b)(3).  A motion to dismiss for lack of capacity will be denied if
the complaint alleges facts that, taken as true, show that the plaintiff has capacity to sue.  *See De
Aguilar v. Boeing Co.*, 47 F.3d 1404, 1415 (5th Cir. 1995); *Lozano v. Smith*, 718 F.2d 756, 773 n.38
(5th Cir. 1983).  Whether Hall has the capacity to pursue the state-law claims on behalf of her
deceased daughter's estate depends on the Texas survival statute, TEX. CIV. PRAC. & REM. CODE
§§ 71.021.  *See Roberts v. City of Shreveport*, 221 F. App'x 314, 315 (5th Cir. 2007) (citing *Rhyne
v. Henderson Cnty.*, 973 F.2d 386, 390–91 (5th Cir. 1992) (looking to the Louisiana survival statute
to determine whether the decedent's mother could bring an action under § 1983 on behalf of the

decedent's estate based on the decedent's injuries)).  Texas's survival statute provides:

> (a)  A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.
>
> (b)  A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person. The action survives against the liable person and the person's legal representatives.
>
> (c)  The suit may be instituted and prosecuted as if the liable person were alive.

TEX. CIV. PRAC. & REM. CODE §§ 71.021.

Hall may sue on behalf of J.C.P.'s estate if (1) she is an heir, legal representative, or represents the estate and (2) the cause of action is for "personal injury to the health, reputation, or person" of J.C.P.  *See id.*  Hall alleges in the complaint that she is the administrator of J.C.P.'s estate, which gives her the capacity to sue on its behalf.  *See Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 786 (Tex. 2006) ("In this case, it is undisputed that the Terks are the independent executors of their father's estate."); *Nursing Ctr. Inc v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) ("Because a decedent's survival claim becomes part of her estate at death, it follows that the estate retains a justiciable interest in the survival action."); *see also* TEX. PROB. CODE § 3(aa) (including "administrator" as among the parties that qualify as a "personal representative").  Regardless of her ability to sue on J.C.P.'s behalf before the child's death, Hall may bring a claim on behalf of the estate in her capacity as the personal representative.  There is no basis to conclude that the July 2009 order making the TDFPS J.C.P.'s sole managing conservator deprives Hall of standing to sue on behalf of J.C.P.'s estate.  The motions to dismiss on this ground are denied.

### 2.    Hall's Standing to Seek Injunctive Relief

Texas Supreme Court Chief Justice Wallace Jefferson and Justice Harriet O'Neill argue that Hall has no standing to seek declaratory or injunctive relief against them.  The applicable legal standard for standing to seek both forms of relief is the same.  This is the only relief Hall seeks from these defendants.

To meet the injury-in-fact element of standing, a plaintiff seeking an injunction must be "likely to suffer future injury." *Lyons*, 461 U.S. at 105.  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . ." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974).  "Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of real and immediate injury." *Id.* at 496.  The threat of future injury to the plaintiff "must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 102 (quotation marks omitted).

To meet the causation element of standing, a plaintiff must show that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (quotations and alterations removed).  An injury is generally insufficient to "confer standing when the injury's existence depends on the decisions of third parties not before the court." *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) (citing, *e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41(1976)).  That does not mean that the defendant's challenged action must be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168 (1997).  An injury may, for example, be fairly traceable to the defendant if the injury was "produced by determinate or coercive effect [of the defendant's challenged action] upon the action of someone else." *Id.* at 169.

The third element, redressability, is similar to the causation requirement.  "To the extent that there is a difference, it is that the former examines the causal connection between the assertedly

21

unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). Redressability is most relevant when the requested relief reaches "well beyond the violation of law alleged" and when the relief sought cannot remedy the harm alleged. *See id.*; *Steel Co.*, 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court . . . .").

As the Supreme Court has explained, "[t]he law of Article III standing is built on a single basic idea—the idea of separation of powers." *Allen*, 468 U.S. at 752. This concern for separation of powers extends to judicial interference with state governments. *See id.* at 759 (citing *Lyons*, 491 U.S. 95). Suits that challenge "particular programs agencies establish to carry out their legal obligations . . . are rarely if ever appropriate for federal-court adjudication." *Id.* at 759–60. As a general rule, the law leaves to states, not the federal courts, to determine how they comply with federal law, and especially their own laws. *O'Shea*, 414 U.S. at 500 (noting the importance of balancing "federal equitable power and State administration of its own law" (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)); *cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding that the Eleventh Amendment prevents federal courts from enjoining states to follow their own laws).

The standing requirements, and these federalism principles, call for dismissal of the claims against Justices Jefferson and O'Neill asserted in Counts V and VI, with prejudice. The counts alleged that the Supreme Court Justices, who allegedly have the power to improve the administration of Texas courts to benefit foster children, deprived J.C.P. of a meaningful opportunity to be heard and of effective representation by counsel in the family and juvenile courts of Harris County. The injunction sought is an order protecting J.C.P. from future harm. But there is no likelihood of future

inadequate opportunity for hearing or for legal representation of J.C.P. before these courts. *Walker v. Livingston*, No. 09-20508, 2010 WL 2465035, at *1 (5th Cir. 2010) (unpublished) (finding it "clear" that plaintiffs asserting a survival claim under Texas's survival statute "lack standing to seek injunctive relief"); *Estate of Felts v. Genworth Life Ins. Co.*, 250 F.R.D. 512, 525 (W.D. Wash. 2008) (noting that the decedent's estate lacked standing to pursue injunctive relief); *Davis v. Cnty. of Amherst*, Civ. No. 6:07cv00017, 2008 WL 591253, at *3 (W.D. Va. Mar. 3, 2008) ("The difficulty faced by Plaintiff is that because Taylor is deceased, there is no possibility that he will have another encounter with the Sheriff's Department.  Plaintiff's harm will not be redressed by injunctive or declaratory relief, and Plaintiff therefore lacks standing.") (citing *Dowdell v. Chapman*, 930 F. Supp. 533, 553 (M.D. Ala. 1996).  *Cf. Palo ex rel. Estate of Palo v. Dallas Cnty.*, Civ. A. No. 3:05-CV-0527-D, 2006 WL 3702655, at *8 (N.D. Tex. Dec. 15, 2006) (holding that a request for "prospective injunctive relief was mooted by the plaintiff's death).  Count VI is dismissed.

Nor does Hall have standing to sue on her own behalf under Count V because her asserted fear of future injury is too speculative.  Hall argues that she will likely come into contact with the constitutionally insufficient courts again through a TDFPS investigation into her other children.  She asserts that she has a "reasonable fear of retaliation by TDFPS and of another unfounded claim of neglect and abuse."  (Docket Entry No. 98, p. 15).  Hall argues that she "could be subjected to yet another judge with overloaded caseloads and biased relationship with attorneys whose interests are inherently adverse to their clients, and to other untrained attorney[s] and guardian[s] ad litem[]." (*Id.*, p. 16).

Courts do not presume the government will break the law.  *Lyons* is instructive on this point. In that case, the plaintiff alleged that he, as well as others, had been subjected to illegal police chokeholds and that some had died as a result.  *Lyons*, 461 U.S. at 98.  The plaintiff sought an

23

injunction against the continued police use of the chokeholds.  The Court of Appeals held that the "odds" of the plaintiff himself encountering another chokehold was sufficiently high to support standing.  461 U.S. at 108.  The Supreme Court disagreed, concluding that it was "surely no more than speculation to assert either that [the plaintiff] himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury."  *Id.*; *accord O'Shea*, 414 U.S. at 497 ("[I]t seems to us that attempting to anticipate whether and when these respondents will be charged with crime and will be made to appear before either petitioner takes us into the area of speculation and conjecture.").  Hall's fears of future exposure to an inadequate tribunal are insufficient to meet the requirement of injury in fact.

Nor can Hall satisfy the causation and redressibility elements of standing necessary for her claims against the Texas Supreme Court justices.  According to the uncontroverted affidavits attached to their motion, the Texas Supreme Court justices have no power to create new judgeships or family courts to alleviate the strains Hall asserts are present in child custody proceedings.  (*See* Docket Entry No. 40, Exs. 1, 2).  At most, the justices can use their positions to encourage the state legislature to increase funding to help alleviate the problems Hall allegedly encountered.  Courts' reluctance to find standing when, as here, the actions of third parties contribute to the future harm the plaintiff fears, is particularly appropriate when the legislature is the third party.  An injunction ordering Texas Supreme Court justices to take action to attempt to influence the legislature to authorize more funds is inconsistent with the separation of powers rationale underlying the standing requirement.  The same is true of Hall's suggestion that this court require a "reallocat[ion of] judicial resources in order to ease the court's caseload."  (Docket Entry No. 90, pp. 18, 19).  Count V is

dismissed as to the Texas Supreme Court justices for lack of standing, with prejudice.[3]

Although the Texas Supreme Court justices are the only parties who have moved for dismissal for lack of standing to seek injunctive and declaratory relief, this court has examined the pleadings on its own to determine whether it has subject matter jurisdiction and concluded that other claims must also be dismissed. Ordinarily, a court must give notice to a party before dismissing its claims, but such notice is not necessary when the dismissal is based on a lack of subject-matter jurisdiction. In *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002), the court dismissed a Lanham Act claim without notice to the parties based on lack of standing, despite the fact that the issue was "never briefed by the parties, questioned by the district court, or even mentioned at oral argument," and the "parties did not have the benefit of a hearing to present evidence on the issue," *id.* at 334 (Benavides, J., specially concurring), as part of the court's duty to consider constitutional standing at the outset. *Id.* at 332 n.1 ("[W]henever possible, Article III standing must be addressed before all the other issues 'because it determines the court's fundamental power even to hear the suit.'" (quoting *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002)). When the basis for finding a lack of standing is limited to the insufficiency of the pleadings, there is even less need for notice. "In situations where a party has not been afforded an opportunity to respond to a court's *sua sponte* concerns about standing," he noted, "it would be unfair to *broaden review beyond the sufficiency of the pleadings*." *Id.* at 334–35 (emphasis added). As the concurring opinion in *Ford* noted, when a plaintiff cannot survive a challenge to standing "based solely on the sufficiency of his pleadings," a court may dismiss for lack

---

[3]   Count III also lists Harris County as a defendant. The complaint makes clear that it seeks damages and injunctive relief against Harris County. (Docket Entry No. 22, ¶ 13). Standing is no bar to the damages claim. *See Lyons*, 461 U.S. at 1109 (noting that the plaintiff had standing for damages claim, but not for declaratory or injunctive relief).

of standing on its own, without notice, based on the pleadings.[4]  *Id.* at 336.

Following this precedent, this court examines Hall's claims in Counts III and X.  Count III essentially alleges violations by Memorial Hermann, TDFPS employees, and Harris County CPS of her right under the Texas constitution to direct the care of her child.  Count X alleges violations by these same defendants of J.C.P.'s Texas statutory rights to a properly screened and supervised foster home.  Hall seeks an injunction as her only remedy in these two counts.  Although Hall originally sought damages under the Texas constitution, she abandoned that claim after the TDFPS defendants pointed out that there are generally no damages for violations of the Texas constitution. (Docket Entry No. 59, p.3 ("Although damages are not available to remedy violations of the Texas Constitution, Plaintiff may seek equitable remedies.")).  Hall has also abandoned her claim for damages based on the statutory injuries to J.C.P. she alleges in Count X.  (Docket Entry No. 59, p. 16).

Hall has no standing to seek injunctive relief against future injuries to J.C.P.  The claim for such relief under Count X is dismissed.  Although Count III alleges a violation of Hall's own right to direct the medical care of her child and seeks an injunction to protect that right against future injury, there is nothing in the complaint to suggest that the possibility of such future injury is more than speculative.  Hall argued in response to motions to dismiss that she fears retaliation by TDFPS employees that will injure her right to direct the care of her other children.  But there is no allegation in her complaint of any basis to believe that such retaliation is likely.  She does not allege any threat of retaliation or any effort by TDFPS to interfere with her right to direct the care of her other

---

[4]   In a similar situation, the Fifth Circuit, sitting en banc, dismissed a case for mootness "without giving the parties full time for briefing and without hearing them fully on the issue at oral argument." *Rangra v. Brown*, 584 F.3d 206, 209–210 (5th Cir. 2009) (en banc) (Dennis, J., dissenting).

children.  The specific rights violation alleged is to Hall's right to direct her children's medical care. To show the requisite injury, she would have to allege a sufficient probability of the same kind of injury she suffered with respect to J.C.P.  But as the complaint acknowledges, those alleged injuries all occurred in the context of efforts to care for a fragile, premature, sick baby, when doctors and TDFPS employees strongly disagreed with the mother's medical decisions about that baby.  The complaint contains no allegations that such a situation is likely to recur with Hall's other children. Count III is dismissed for lack of subject matter jurisdiction.

The dismissal of the parties and counts for lack of subject matter jurisdiction are with prejudice and without leave to amend, because amendment would be futile.

## III.  The Motions to Dismiss for Failure to State a Claim and for Summary Judgment

### A.  The Applicable Legal Standards

#### 1.  Rules 12(b)(6) and 12(c)

The same standards govern motions to dismiss under Rule 12(b)(6) and Rule 12(c).  *Chauvin v. State Farm Fire & Cas. Co.,* 495 F.3d 232, 237 (5th Cir.2007); *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).  Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b) (6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2). *Twombly* rejected the Supreme Court's prior statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Twombly*, 550 U.S. at 562–63.  To withstand a Rule 12(b)(6) motion, a complaint

must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008). Under Rule 8(a)(2), plaintiffs are not required to include "'detailed factual allegations,' but more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation' is needed." *Id.* (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)). However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed.1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam) ("'[A] district court acts within its discretion when dismissing a motion

28

to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir.1999))).

In examining whether an amended complaint would be subject to dismissal for failure to state a claim, the court applying the Rule 12(b)(6) standard generally cannot look beyond the pleadings. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229, 120 S. Ct. 2659, 147 L. Ed. 2d 274 (2000); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 340 (5th Cir. 2008) (finding that because a Rule 12(b)(6) "review is limited to his complaint and its proper attachments, we may not consider any additional evidence or pleadings."); *Fin. Acquisition Ptnrs. v. Blackwell,* 440 F.3d 278, 289 (5th Cir. 2006) (affirming the district court's refusal to review facts outside the complaint when reviewing a Rule 12(b)(6) motion; *Orthopro, Inc. v. Arthrex, Inc.,* 2009 WL 1374773, 2009 U.S. Dist. LEXIS 41697 (N.D. Tex. May 18, 2009) (stating that the "court will not consider [a letter attached to a Rule 12(b)(6) pleadings but not mentioned in the complaint] in ruling on the motion to dismiss.").   If a court wishes to consider such extrinsic or additional materials, it must convert the motion to one under Rule 56 for summary judgment.  *Tremont LLC v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 852–53 (S.D. Tex. 2010).   There is a recognized exception for  "[d]ocuments that a defendant attaches to a motion to dismiss [that] are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004).

### 2.        The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.     The Motions by the TDFPS Defendants

The TDFPS defendants are TDFPS itself and its employees, Clay, Donatto, Dixon, Smith, and James. The TDFPS defendants have filed two sets of dispositive motions. First, Hasley,

30

Donantto, Dixon, Smith, and Clay filed a motion to dismiss under Rules 12(b)(6) and 12(c). (Docket Entry No. 39). Hall responded by disputing the defendants' entitlement to dismissal and requesting additional discovery in the alternative. (Docket Entry No. 46). The defendants also joined with TDFPS employees James, Lasco, and TDFPS in moving for summary judgment, (Docket Entry No. 63, 74). Hall responded, requesting additional discovery. (Docket Entry No. 75). At the February 8, 2010 conference held in this court, Hall specified the additional discovery she wanted. She asked for a copy of the TDFPS handbook in effect during the period when TDFPS was involved with Hall and J.C.P. (Docket Entry No. 89, p. 16). TDFPS agreed to provide the handbook. (*Id.*, p. 28). Hall was also granted discovery into case files for children with serious medical issues who had been placed in foster care and had died in those placements. (*Id.*). Hall asked for information on the training that the TDFPS workers involved in J.C.P.'s case received. (*Id.*, p. 30). TDFPS agreed to produce this information. (*Id.*). Hall asked for information on the workers' caseloads, which TDFPS agreed to provide. (*Id.*). TDFPS also agreed to produce the caseworkers involved in J.C.P.'s case for Hall's counsel to depose. In response to a question from TDFPS's lawyer about the scope of the depositions, this court clarified that even though the depositions were to be focused on qualified immunity issues, that would not "present a significant limit on the factual areas to be inquired into." (*Id.*, p. 33). The court instructed TDFPS to produce the written materials within thirty days and to schedule the depositions within thirty days afterward. (*Id.*, p. 35). That was on February 8, 2010. Nearly eight months later, Hall has not responded to the TDFPS defendants' motion for summary judgment. Nor has she moved under Rule 56(f) requesting more discovery.

The motions and the summary judgment record are analyzed below.

### 1.   The Summary Judgment Evidence

The record shows that J.C.P. first came to TDFPS's attention after it received a report of

neglect from Memorial Hermann Hospital on December 24, 2007.  (Docket Entry No. 63, Ex. B, Att. 1).  Donatto began an investigation with the approval of her supervisor, Halsey.  During the investigation, Donatto spoke with Memorial Hermann employees and with Hall.  (*Id.*, Ex. B).  In her meetings with the hospital employees, Donatto learned that J.C.P. had been intubated from birth and suffered a near-fatal disintubation on December 21, 2007, when she apparently pulled the tube out.  (*Id.*, Ex. B, Att. 1).  Doctors had originally suggested the tracheostomy, which would allow them safely to remove the tubes from J.C.P., in October 2007.  (*Id.*).  Hall asked for a second opinion, which Memorial Hermann provided.  Hall then asked for another opinion, this one from outside Memorial Hermann.  (*Id.*).  Donatto learned that after the doctors recommended the tracheostomy procedure, Hall agreed to it several times, only to change her mind before the surgery could be completed.  (*Id.*).

Donatto attempted to contact Hall on December 27 and January 2, with no success.  (*Id.*).  It was not until January 8 that Donatto managed to speak with Hall.  (*Id.*).  Hall told Donatto that she would not consent to the tracheostomy without a second opinion from outside Memorial Hermann,   and that Donatto's involvement was "offensive."  (*Id.*, Ex. B).

Donatto learned that the Memorial Hermann doctors tried to help Hall arrange for her insurer to pay to transfer J.C.P. to another hospital to obtain the independent second opinion.  That transfer could not be arranged.  It would require the doctors to certify that J.C.P. needed a higher level of care than Memorial Hermann could provide.  (*Id.*).  Donatto learned that the doctors felt that they could not truthfully make that certification.  (*Id.*).

Memorial Hermann, Hall, and Donatto learned on January 14 that Hall would not be able to get a second opinion from outside Memorial Hermann.  (*Id.*, Ex. B & Att. 1).  Donatto, with Halsey's approval, initiated proceedings to give Memorial Hermann temporary conservatorship.

32

(*Id.*, Ex. B).   The next day, January 15, a judge granted Memorial Hermann temporary conservatorship.  The hospital performed the tracheostomy on January 18.  (*Id.*, Ex. B, Ex. E). Halsey and Donatto had no further involvement after that point.  (*Id.*, Ex. B, Ex. C).

Lasko began working on J.C.P.'s case on March 12.  (*Id.*, Ex. E).  His job was to visit J.C.P. at the hospital monthly and provide updates to the guardian and attorney *ad litem* appointed by the court.  (*Id.*).  While J.C.P. remained in the hospital, Hall received training on how to care for her. After a stay at HealthBridge, J.C.P. went home to Hall's care for the first time on June 19, 2008. On August 4, J.C.P. received "2nd to 3rd degree burns on her feet, ankles, and genitals."  The TDFPS report of the incident stated that the injuries came from scalding bath water.  (*Id.*, Ex. D). Hall had placed J.C.P. in the water without checking the temperature.  Hall did not immediately realize that J.C.P. was in pain; J.C.P.'s damaged voice box left her unable to cry out.  (*Id.*, Ex. F). Hall attributed the unexpectedly hot water to recent plumbing work.  (*Id.*, Ex. D).  J.C.P. had to return to the hospital.  Lasko's last visit with J.C.P. and Hall occurred on August 7.  (*Id.*, Ex. E). He had no further involvement in J.C.P.'s case.  (*Id.*, Ex. E).

On August 19, during preparations at the hospital to release J.C.P. back to Hall's custody, a nurse had to intervene to keep Hall from again burning J.C.P. in bath water.  (*Id.*, Ex. F, Att. 3.A). After this incident, Rhodes, the attorney *ad litem,* requested an emergency hearing.  On August 21, the state court ordered that Hall have no access to J.C.P. and that the photographs of J.C.P.'s burns be provided to law enforcement.

On September 11, the 315th District Court ordered, pursuant to a settlement reached between Hall and Rhodes, that Hall be allowed supervised visits with J.C.P.  (*Id.*, Ex. F).  TDFPS had originally planned to return J.C.P. to Hall's custody, but the settlement and resulting order also required TDFPS to arrange for foster care for J.C.P.  Smith, who after August 2009 served as the

33

primary monitor on J.C.P.'s case for TDFPS, sent a foster-care placement request to the Harris County CPS Centralized Placement Team.  On August 24, Hall's niece submitted an application to become J.C.P.'s caretaker.  Hazley, the director of Harris County CPS, rejected the application because Hazley did not believe the niece's work schedule would allow her time to care for J.C.P. (*Id.*, Ex. H).  Smith asked Hall several times to recommend others who could take care of J.C.P. According to Smith, Hall's only suggestions were Barbara Ates, who lived in California, and Tassandra Allen, who lived in Pearland, just south of Houston.  (*Id.*).  Smith did not receive these names from Hall's attorney until March 9.  (*Id.*).  TDFPS could not place J.C.P. with Ates, because she and her husband did not meet California's licensing requirements for foster care.  Smith submitted a service authorization for Allen on March 25, and she was approved in May 2008.  But because TDFPS was unable immediately to place J.C.P. with any family member, Harris County CPS placed her with Cochran, who had been approved as a foster caregiver by Lutheran Social Services.

As part of the transition from the hospital to Cochran's care, TDFPS had to arrange for Hall to give J.C.P.'s medical equipment to Cochran.  Harris County CPS had arranged for Medicaid to rent the equipment for Hall, but Medicaid would authorize only one set of equipment.  The medical equipment included a monitor equipped with an alarm.  This was not, however, the type of monitor and alarm described in the complaint.  The complaint alleged that an alarm would sound if J.C.P.'s tracheostomy tube detached.  (*See* Docket Entry No. 22, ¶ 138).  Instead, the monitor gave an alarm when J.C.P.'s oxygen level fell, which could occur if she had difficulty breathing.  (Docket Entry No. 63, Ex. F).  Hall was initially contacted about returning the equipment so it could be transferred from her home to Cochran's on September 14.  Hall still had not returned the equipment by October 1.  On that date, she still could not give a convenient time for the equipment to be picked up.  (*Id.*).

34

On October 7, Hall agreed to give the equipment to a courier the next day.  (*Id.*).  According to Smith's affidavit, when the courier came to her home, Hall "refused to give him all of the equipment, cursed at him and slammed the door in his face."  (*Id.*).  Finally, after a court order, the equipment was retrieved on November 12.  In the meantime, Cochran received loaner equipment from a rental company.  (*Id.*, Ex. F, Att. 1).  In her affidavit, Smith states that every time she saw Cochran and J.C.P., the equipment was in place.  (*Id.*, Ex. F).

In September 2008, when the court allowed Hall to have supervised visits with J.C.P., Smith added Hall's other children and her niece, Nefertitti Rhodes, to the visitation list so that they could accompany Hall on visits.  (*Id.*).  During Smith's assignment to J.C.P.'s case, she completed monthly reports on her interactions with Hall.  The reports contain  between three and eight entries per month.  (*Id.*, Ex. F., Att. 1).  The entries reflect observations on J.C.P.'s health, potential problems with the custodial situation, significant events affecting J.C.P., and Smith's assessment of how those involved in J.C.P.'s life were handling the situation.  The assessments do not convey the uniformly negative attitude toward Hall that the complaint alleges.  For example, an entry dated November 5, 2008 reports that Hall "pick[ed] up [J.C.P.] and began hugging and kissing her.  Ms. Hall loves [J.C.P.] and was very affectionate towards the child."  (*Id.*, Ex. F, Att. 1).  A May 4, 2009 entry states that the "family members appear very concerned about [J.C.P.'s] well-being and love her." Other parts of the TDFPS file on J.C.P. are also inconsistent with Hall's allegation in the complaint that the agency intended to keep J.C.P. away from her family.  Through May 2009, Smith expressed the goal of having TDFPS become J.C.P.'s permanent managing conservator and having her adopted by a relative.  On May 19, Smith told Rhodes, the attorney *ad litem*, that this remained the agency's goal. (*Id.*).  The next day, however, TDFPS informed Rhodes that it did not plan to seek termination of Hall's parental rights.  (*Id.*).  At that point, Rhodes sought an emergency hearing.  At the June 1

35

hearing, Rhodes asked for the trial on Hall's parental rights to be scheduled in July 2009, and the court directed mediation. The mediation on June 23 resulted in the settlement under which TDFPS became J.C.P.'s permanent managing conservator.

During this period, Cochran, the foster parent, had arranged for medical care for J.C.P. By February 2009, Cochran had enrolled J.C.P. in the Early Childhood Intervention Program, which provided weekly physical and speech therapy. (*Id.*). Dr. Edmonds at Memorial Hermann met with Hall, her family, and Cochran on June 3, 2009. (*Id.*). Dr. Edmonds informed them that J.C.P.'s trachea was completely closed because of scar tissue and that she would need surgery. (*Id.*). According to Smith's report, that surgery "may occur some time this summer." (*Id.*). The report does not give a date by which the surgery had to be done or state that it was urgent. On June 10, Cochran told Smith that J.C.P. would require another sleep study to examine her breathing. (*Id.*). The TDFPS reports have no further entries until J.C.P.'s death on July 12.

### 2.     The Claims Against TDFPS and Its Employees in Their Official Capacity

The motion for summary judgment filed by TDFPS and the evidence they have submitted shows that there are no genuine issues of disputed fact materials to determining that it is not liable as alleged, as a matter of law. TDFPS and its employees are entitled to dismissal of these claims, with prejudice.

TDFPS first argues that the § 1983 claims against it must be dismissed because it is not a "person" within that statute. Although Hall did not assert violations of § 1983 against TDFPS, she asserted them against James, TDFPS's deputy director, in her official capacity. These allegations are treated as allegations against TDFPS. *See Price v. Housing Auth. of New Orleans*, 320 F. App'x 214, 216 (5th Cir. 2009) (per curiam) ("A suit against a state officer in his official capacity is treated

as a suit against the state.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Neither a state nor a state agency is a "person" within the meaning of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Cronen v. Tex. Dep't of Human Svcs.*, 977 F.2d 934, 936 (5th Cir. 1992). TDFPS cannot be sued under § 1983. *See Smith v. Dep't of Family & Protective Svcs.*, Civ. A. No. SA-08-CA-940-XR, 2009 WL 2998202, at *2 (W.D. Tex. Sept. 15, 1999) (noting the court's earlier dismissal of § 1983 claims against TDFPS); *Brackens v. Tex. Health & Human Svcs. Comm'n*, No. A-06-CA-682 LY, 2006 WL 3227671, at *2 (W.D. Tex. Nov. 3, 2006) (recommending dismissal of a § 1983 claim against TDFPS). Hall cannot pursue claims under § 1983 against TDFPS or its employees in their official capacities.

TDFPS next argues that the related state-law negligence claims against it should be dismissed under sovereign immunity. Under the Texas Tort Claims Act (TTCA), TEX. CIV. PRAC & REM. CODE § 101.001 *et seq.*, the state, including its agencies, is generally immune from tort liability, with limited exceptions. *See id.* §§ 101.001, 101.025; *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 553 (Tex. 2002). The TTCA waives sovereign immunity in "three general areas[, the]

use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property." *Brown*, 80 S.W.3d at 553 (quoting *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 611 (Tex. 2000)) (quotation marks omitted).  Under the TTCA, a Texas agency can be liable only for the effects of its employees' use of personal personal property.  *See San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 245–46 (Tex. 2002).  TDFPS argues that the state-law negligence claims must be dismissed because there is no waiver of immunity for suit or liability arising from the actions of the foster parent, Cochran, who was not a state employee.  TDFPS also argues that it cannot be liable for negligence under a state-law negligence claim for J.C.P.'s death because no TDFPS employee "use[d]" the tracheal tube that  disengaged, causing the death.

Under the TTCA, an "employee" of the state or state agency is:

> a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

TEX. CIV. PRAC. & REM. CODE § 101.001(2).  The only reported Texas court decision analyzing whether foster parents are "employees" under the TTCA concluded that:

> foster parents . . . do not meet the definition of government employees under the [TTCA].  Unlike employees, foster parents . . . are not paid a salary, nor are they otherwise "in the paid service of a governmental unit."  Instead, foster parents are only reimbursed for expenditures made on behalf of the child.   Indeed, these "reimbursements" are not "income" for tax purposes.  I.R.C. § 131. Under these facts, [foster parents are] not in the paid service of DFPS and, therefore, [are] not employees under the Act.

*Tex. Dep't of Family & Protective Servs. v. Atwood*, 176 S.W.3d 522, 529–30 (Tex. App.—Houston [1st Dist.] 2004) (footnotes and citations omitted).  This analysis is persuasive.  Cochran's acts or omissions are not attributable to TDFPS under the TTCA.

38

In Hall's response, she does not argue that Cochran is an "employee" of TDFPS. Hall instead contends that summary judgment dismissing the state-law negligence claim against TDFPS and James is inappropriate because TDFPS employees "used" the tracheostomy tube when J.C.P. underwent the tracheostomy procedure. But Hall does not argue, and no summary judgment evidence shows, that performing the tracheostomy procedure caused J.C.P.'s death. And Hall's negligence claim is that TDFPS and its employees knew or should have known that Cochran was inadequately performing her duties as a foster parent for J.C.P. and failed to intervene. Hall does not allege, and no evidence shows, that TDFPS was negligent in its role leading to the tracheostomy procedure performed. Even if facilitating J.C.P. having the tracheostomy could be considered "use" by TDFPS employees of the tracheostomy tube, Hall's claim fails because the negligence she alleges—failing to remove J.C.P. from Cochran's care—does not involve the tube.

Summary judgment is granted as to the negligence claim against TDFPS and James.

### 3.   The Claims Against the TDFPS Employees in Their Individual Capacity

The TDFPS employees move for summary judgment as to each of the numerous federal claims asserted against them under § 1983. The complaint alleges violations of two constitutional rights: Hall's and J.C.P.'s right to family integrity, and J.C.P.'s right to personal security in foster care. She also alleges violations of federal statutory rights under the Child Welfare Act and the EPSDT provisions of the Medicare Act.

The threshold issue is the qualified immunity defense the TDFPS employees have asserted. Qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526

39

U.S. 603, 614 (1999).  The purpose is to "strike a balance between competing social objectives, providing breathing space for the vigorous exercise of official authority, while at the same time allowing a possibility of redress for victims of officials' abuses." *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Reg. Servs.*, 380 F.3d 872, 879 (5th Cir. 2004).  Qualified immunity involves a two-step analysis.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  One step considers whether "the facts alleged show the officer's conduct violated a constitutional right." *Hernandez*, 380 F.3d at 879.  The second step requires the court to analyze whether the defendant's actions were "objectively reasonable in light of clearly established law at the time of the incident." *Id.*  A court may dismiss based on the second step without considering the first. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Hall's claims against James, TDFPS's deputy director, and Dixon, CPS director for Region 6, are that they failed to train or supervise the employees assigned to J.C.P.'s case.  To hold a supervisor liable for failure to train or supervise a subordinate under § 1983, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998)).  "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Smith*, 158 F.3d at 912).  The "plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Id.* "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in

40

question.  That is, notice of a pattern of similar violations is required."  *Id.* at 383.  "Moreover, a showing of deliberate indifference requires that the Plaintiffs show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights."  *Id.* (citing *Cousin v. Small*, 325 F.3d 627, 799 (5th Cir. 2003)); *see also Valle v. City of Houston*, 613 F.3d 536, 548–49 (5th Cir. 2010) (noting that it is "difficult to show deliberate indifference" when the court must question officials' decisions regarding the "best allocation of limited resources").

There is no evidence in the record showing any pattern of rights violations concerning medically fragile children; that James or Dixon knew of such a pattern, if it existed; that their decisions about training or supervision resulted from a conscious choice to endanger rights instead of good-faith decisions about how to appropriately use resources that Hall's complaint admits were inadequate; or that any specific inadequacies in training or supervision were the "moving force" behind the injuries in this case.[5]  Hall's claims against Dixon and James, the TDFPS supervisors, cannot survive summary judgment.

Hall makes a number of allegations against the case workers actually involved in J.C.P.'s case, James, Dixon, Donatto, Smith, Lasco, and Halsey.  Hall alleges that these TDFPS employees violated her right, and J.C.P's right, to "family integrity."  "[T]he right of the family to remain together without the coercive interference of the awesome power of the state is the most essential and basic aspect of familial privacy . . . ."  *Kiser v. Garrett*, 67 F.3d 1166, 1172 (5th Cir. 1995) (quoting *Hodorowski v. Ray*, 844 F.2d 1210, 1212 (5th Cir. 1988)) (quotation marks omitted); *see also Stanley v. Illinois*, 405 U.S. 645, 649 (1972).  This right of the family to "remain together" may

---

[5]   As noted above, this court allowed Hall discovery into the TDFPS investigators' training,  the policies in effect during the TDFPS investigation until J.C.P.'s death, and placements of medically fragile children in foster care.

extend beyond the "nuclear family" to other relatives, such as "aunts, uncles, cousins, and grandparents." *Wooley v. City of Baton Rouge*, 211 F.3d 913, 921 (5th Cir. 2000) (citing *Moore v. City of E. Cleveland*, 431 U.S. 494, 505 (1977)).  Hall contends that qualified immunity is defeated because the right to "family integrity" is clearly established.  The Fifth Circuit's precedents reject that position.  "[R]easonable government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited." *Doe v. Louisiana*, 2 F.3d 1412, 1417 (5th Cir. 1993).  The uncertainty is present because the right to "family integrity" is not absolute; the state can interfere with family relationships to protect children.  *Morris v. Dearborne*, 181 F.3d 657, 669 (5th Cir. 1999); *see also Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992) ("Because th[e] interest [in family integrity] must always be balanced against the governmental interest involved, it is difficult, if not impossible, for officials to know when they have violated 'clearly established' law.").  To evaluate a claim of qualified immunity in a family-integrity case, a court must place the case

> along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy.  When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity.  However, when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

*Id.*

The Fifth Circuit has repeatedly observed that social workers, whose job requires them to investigate, judge, and often take action antagonistic to the parent-child relationship, operate at the nebulous frontier of the right to family integrity.  *Wooley*, 211 F.3d at 924 ("Our cases in which the

state's interest has blurred the existence of a family's rights uniformly have involved removal of children by social workers specifically charged with protecting children where there were allegations of abuse."); *Brian T. v. Ward*, No. 99-30487, 2000 WL 423409, at *1 (5th Cir. Apr. 5, 2000) ("*Morris*, however, is distinguishable, as appellant sued social workers whose primary duty is to investigate allegations of child abuse."); *Morris*, 181 F.3d at 657 ("The facts of those cases placed them close to the line between the rule—families are constitutionally entitled to be free of governmental interference in child raising decisions[—]and the exception—child welfare workers can take temporary custody of children about whom they have received reports of abuse in order to guarantee their safety.").  By contrast, the court has found violations of clearly established law only when state employees who are not social workers have acted to separate children from their families without evidence of harm to the child.  *Wooley*, 211 F.3d at 924 (holding that officers were not entitled to qualified immunity when there was "no indication in this record of any threat to [the child's] safety, nor were the officers investigating allegations that he previously had suffered abuse at the hands of " his parents); *Morris*, 181 F.3d at 671–72 ("[I]t can certainly come as no surprise to . . . a teacher[] that she was not free to manufacture from whole cloth evidence of sexual abuse.)

In light of these cases, the evidence relating to the investigation into J.C.P.'s safety in Hall's custody, and the decision to separate J.C.P. from Hall (and, as a consequence, her siblings), does not raise a fact issue as to a violation of a clearly established right.  TDFPS intervention followed two events reported to the agency.  The first was a report from Memorial Hermann that Hall would not authorize a medical procedure for J.C.P. that was both necessary and urgent.  The second was J.C.P.'s return to the hospital with multiple severe burns she received under Hall's care.  The undisputed evidence is that these events were reported by third parties to TDFPS.  After receiving reports on these events, the evidence shows that TDFPS interviewed numerous individuals,

43

including Hall.  TDFPS's interest in protecting J.C.P. is clearly sufficient to provide qualified immunity for the case workers involved in investigating the reports of neglect, and the undisputed evidence in the record shows that the investigation conducted and the decision to separate J.C.P. from Hall's custody were objectively reasonable.

Hall also alleges that after TDFPS removed J.C.P. from her care, the case workers made insufficient efforts to place J.C.P. with a family member, provide "meaningful visitation with her siblings," or work toward reuniting the family.  Hall alleges that these failures violated the right she and her daughter had to family integrity.  The complaint alleges that Hall's relatives "were given a litany of excuses as to why they were not fit to be granted possession" of J.C.P: one relative was not fit because she would have to place J.C.P. in day care while she worked; a California relative who was a former licensed emergency foster-care provider was not investigated; and relatives were unable to visit J.C.P.  (Docket Entry No. 22, ¶¶ 130–35).  Hall relies on *Aristotle P. v. Johnson*, 721 F. Supp. 1002 (N.D. Ill. 1989), for the proposition that the state cannot separate siblings without a compelling interest.  In that case, the court stated that "placing siblings in separate placements and then failing to provide visits among siblings on a reasonable basis violated their right to freedom of association," unless the state provided a compelling interest.  *Id.* at 1005.  Assuming without deciding that the case would provide a clearly established right in some cases, it does not do so in this case.  In *Whalen v. County of Fulton*, the Second Circuit distinguished *Aristotle P.* from the case before it, in which one of the siblings had not lived with the other family members and whose infrequent visits  did not show an "ongoing relationship."  126 F.3d 400, 404–05 (2d Cir. 1997). J.C.P.'s sadly short life did not include extended time at home with her siblings.  J.C.P.'s fragile health meant that she spent long periods hospitalized and left her unable to communicate.  J.C.P.'s

right to live with or spend time with her siblings under these circumstances was not clearly established.[6]

Hall asserts the right of a child to be placed with a relative instead of a foster parent. Hall has cited no case that supports a clearly established obligation on the part of the state to achieve such a placement once it removes a child from parental custody. Hall cites no case for the proposition that the right to family integrity extends to a right to have family members chosen as foster parents after the state has removed a child from parental custody. Even assuming such a right were clearly established, the record does not give rise to a fact issue as to whether the TDFPS employees were objectively unreasonable in their efforts to place J.C.P. As the complaint acknowledges, TDFPS investigated and approved placing J.C.P. with Hall's niece, Tassandra Allen, in May 2009. (*Id.*, ¶ 134). Hall has cited no case holding that temporary custody by a nonrelative pending investigation into a relative as a potential custodian violates a clearly established right.

Even if there were a clearly established right to have TDFPS employees diligently work toward providing visitation and placing J.C.P. with relatives in this case, the evidence shows that the TDFPS employees made objectively reasonable efforts to do so. The complaint faults for TDFPS for its delay in investigating Allen as a caregiver for J.C.P., but the undisputed summary judgment evidence shows that the extent and timing of the efforts to do so were objectively reasonable. TDFPS employees worked with Hall to get information on family members who might

---

[6]   Hall cites *R.C. ex rel. Ala. Disability Advocacy Project v. Hornsby*, No. 88-D-1170-N (M.D. Ala. Apr. 19, 1989), for the proposition that "the placement of [a] child in [a] treatment center far from family, making regular contact difficult, may violate [the] right to family integrity." (Docket Entry No. 59, p. 14). Hall did not attach the case to her memorandum, and this court has been unable to locate it through the standard commercial databases and PACER. But the proposition Hall identifies is more limited than establishing a clearly established right. Rather, the cited portion states only that such a placement that makes family visits difficult "may" violate the right. In this case, the record shows that Smith, the TDFPS case worker, made efforts to facilitate family visits. (Docket Entry No. 63, Ex. F, Att. 1).

care for J.C.P. The first two Hall suggested were investigated and rejected, one because the law of the state where she lived (California) would not allow her to serve as a foster parent, and the other because she worked and could not provide sufficient care. The summary judgment evidence also shows that Smith arranged for other family members to visit J.C.P. when Hall was allowed to visit.

In Count VIII, Hall alleges that James, Dixon, Halsey, Lasco, and Smith violated J.C.P.'s right to personal security and reasonably safe living conditions in foster placement. Hall argues that J.C.P. had a right to placement that was safe under the standard of reasonable professional judgment, not the standard of deliberate indifference. But the law is clear that deliberate indifference, not negligence, is the appropriate standard for liability for § 1983 claims and qualified immunity defenses to those claims. *Hernandez*, 380 F.3d at 879. The Fifth Circuit considered similar allegations against TDFPS employees in *Hernandez*, concluding that the employees were immune from liability and that deliberate indifference was the appropriate standard. 380 F.3d at 876. In that case, the parents sued TDFPS employees for placing their child in a foster home where he suffocated to death. The court held that no employee could be liable for violating federally protected rights unless she knew "of facts from which the inference could be drawn, that placing children in the . . . foster home created a substantial risk of danger." *Id.* at 872. The court, which was reviewing the denial of a motion for summary judgment based on qualified immunity, examined the evidence as to the individual TDFPS employees' conduct, emphasizing that "actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Id.* at 883 (citing *Alton v. Texas A&M Univ.*, 168 F.3d 196, 209 (5th Cir. 1999)). To deny qualified immunity, the employee must have "refused to verify the underlying facts that he strongly suspected to be true, or declined to confirm inferences

of risk that he strongly suspected to exist." *Id.* at 884 (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (alterations removed)).  The court held that the evidence of the case workers' visits to the foster home in response to reports of abuse did not fall into this category.  *Id.* at 883–84.  There was one report that a TDFPS case worker had failed to investigate—a report that the child had a "swollen, red jaw"—but the case worker had received an explanation for the bruise and the absence of evidence that this was a severe injury meant that as a matter of law, there was no deliberate indifference.  *Id.*  Under *Hernandez*, deliberate indifference is the appropriate standard to apply to the § 1983 allegations.

The complaint contains two allegations that TDFPS employees knew that Cochran's home was not safe for J.C.P.  First, the complaint alleges that unnamed TDFPS employees "were all well aware, or should have been aware, that Cochran worked outside of the home and often engaged in other activities that prevented her from providing the direct, continuous observation necessary to ensure [J.C.P.'s] safety and well-being."  (Docket Entry No. 22, ¶ 137).  Insofar as this allegation charges negligence, there is no basis for liability under § 1983.  *Hernandez*, 380 F.3d at 883.  But this is also an allegation that TDFPS employees actually knew of a condition that would present "substantial danger" to J.C.P. in Cochran's care.  Another paragraph in the complaint alleges that Hall "alerted" J.C.P.'s case worker, Smith, "to the fact that Cochran was traveling without . . . medical equipment on more than one occasion," (Docket Entry No. 22, ¶ 138), and that the equipment was "crucial to [J.C.P.'s] care since it alerted anyone in [J.C.P.'s] presence when the trach tube became disengaged by emitting a loud beeping sound."  (*Id.*).  Hall alleges that when she reported this problem, "Smith simply waived her hand and responded nonchalantly as if it did not matter."  (*Id.*).  These portions of the complaint allege notice to Smith of a specific danger to J.C.P. in her foster placement and a failure to investigate it.  But there is no evidence in the record from

which a jury could conclude that any TDFPS worker violated a clearly established right or acted in an objectively reasonable manner.  The competent record evidence shows that TDFPS employees repeatedly tried to arrange for Hall to provide Cochran with medical equipment J.C.P. needed.  TDFPS arranged for Cochran to have rented medical equipment when there were delays in obtaining the equipment from Hall.  The record shows that TDFPS made significant efforts to ensure that J.C.P. had the medical equipment she needed.  The record also shows that Smith observed that Cochran had the medical equipment J.C.P. needed every time Smith saw her.  The record also shows that the TDFPS employees who saw Cochran and J.C.P. together did not observe that Cochran was neglectful or distracted.  The record presents no evidence to support the complaint allegations that Smith knew of and ignored signs that Cochran endangered J.C.P. by not having the medical equipment or by paying insufficient attention.  As a matter of law, the undisputed record evidence shows that the TDFPS employees are immune from liability for violating a constitutionally protected right to safe foster care placement.

Hall also alleges violations of a number of federal statutory rights.  She alleges violations of the Child Welfare Act, 42 U.S.C. §§ 671(a) (10), 671(a)(16), 622(b)(10)(B)(ii), & 675(1), and the EPSDT provisions of the Medicaid Act, as set forth in § 1396d®).  In addition to arguing that the facts alleged in the complaint do not state a claim for violations of these laws, the TDFPS defendants argue that § 1983 does not create a private right of action to enforce violations of these laws.  "The fact that a federal statute has been violated and some person harmed does not automatically give rise to a private right of action in favor of that person."  *Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979)).  "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the

48

Federal Government to terminate funds to the State." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)).  Individuals can enforce the statutes only when Congress "unambiguously confer[s] a right." *Id.* at 283; *Johnson v. Housing Auth. of Jefferson Parish*, 442 F.3d 356, 360 (5th Cir. 2006).

To determine whether a federal statute creates a right enforceable by a private suit under § 1983, courts consider three factors set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997). *Housing Auth. of Jefferson Parish*, 442 F.3d at 360 (citing *Blessing*, 520 U.S. at 340–41).  The Court summarized the three factors in *Gonzaga*:  "Congress must have intended that the provision in question benefit the plaintiff, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence, and the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms."  536 U.S. 273, 282 (quoting *Blessing*, 520 U.S. at 340–41) (quotation marks omitted).  It is not enough for a plaintiff to fall within the zone of interest the statute protects, for the statute to benefit the plaintiff, or for the statute to protect an interest of the plaintiff.  *Id.* at 283.

The Fifth Circuit has held that EPSDT provisions contained in 42 U.S.C. § 1396d®) are enforceable under § 1983.  *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 605–06 (5th Cir. 2004).[7]  The court began with the requirement in the definitions section of the Act that a "'State Plan must provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17) and (21) of this section 1396d of this title to all individuals who meet certain other requirements."  *Id.* at 605 (quoting 42 U.S.C. § 13961(a)(10)(A)(i)).  The court noted that it is "difficult, if not impossible, as a linguistic matter," to distinguish between the

_____

[7]   The portions of the Medicare Act on which the *Dickson* court relied have been amended, but they are the same as those in effect during the events at issue in this case.

language of § 1396d(a)(10)(a)(1) and of Title VI of the Civil Rights Act.  *Id.* (quoting *Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004) (finding the EPSDT provisions are enforceable under § 1983).  The court also noted that the location of this provision in a part of the Act that specifies the requirements of a state plan did not mean that the requirement was not actionable.  *Id.* (citing 42 U.S.C. § 1320a-2).

Hall's allegations and the summary judgment evidence do not, however, provide a basis for recovery for the statutory violation asserted.  The complaint describes J.C.P.'s rights under the Medicaid Act as the "right to receive any and all treatments deemed necessary by a qualified medical professional conducting any of the periodic health examinations required by the EPSDT." That description of J.C.P.'s rights goes beyond the clearly established bounds of the EPSDT program.  The Medicaid Act requires a state such as Texas "to provide medical assistance under the EPSDT program . . . for health care, services, treatments and other measures (1) described in § 1396d(a), that are (2) necessary to correct or ameliorate defects and physical or mental illnesses and conditions discovered by . . . screening services . . . ."  *Id.* at 588.  The Act "defines 'medical assistance' as '*payment* for part or all of the cost of care and services' included in an enumerated list of twenty-seven general health care categories."  *Id.* at 586 (quoting 42 U.S.C. §§ 1396d (a)) (emphasis added).  The clearly established right is not to treatment but to payment for the treatment. Nowhere in the complaint does Hall allege that any TDFPS employee interfered with payment for medical services.  Nor is there any evidence that the TDFPS employees interfered with payment for legal services.  Even if failing to ensure proper medical care were actionable under the statute, there is no evidence that any TDFPS employee breached the duty.  The summary judgment evidence includes uncontroverted reports that J.C.P. received physical and other therapy.  Although Hall alleges that TDFPS failed to pursue scheduling surgery to remove the scar tissue on J.C.P.'s

50

tracheostomy tube insertion point, the summary judgment evidence is that J.C.P.'s doctor recommended that the surgery take place some time during the summer of 2009. J.C.P. died before the summer was over. There is no basis to find a disputed fact issue material to the 42 U.S.C. § 1396d®) claim.

Hall also alleges claims under the Adoption Assistance and Child Welfare Act. 42 U.S.C. § 601 *et seq.* The complaint alleges different types of failures under that Act: failing to train employees on pre-intervention steps to avoid separation from the family; failing to screen and hire caseworkers who can take appropriate pre-intervention measures; failing to keep caseloads at a reasonable level so that caseworkers can train attorneys and guardians *ad litem*; failing to train caseworkers to identify and give preference to relatives in making placement decisions; and failing to train caseworkers to make proper medical interventions in the foster-care environment. (Docket Entry No. 22, ¶ ¶ 68–74). The Fifth Circuit has not addressed whether the provisions of this Act create rights enforceable by private rights of action under § 1983. Other courts have divided on this question. *Compare Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 292 (N.D. Ga. 2003) (finding a right) *with Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 560 (S.D. Miss. 2004) (finding no right). Assuming that the law requires TDFPS to protect the rights that Hall alleges to have been violated and that the Act creates rights enforceable under § 1983, summary judgment is nonetheless appropriate. Hall has neither identified nor presented any evidence that TDFPS employees were inadequately trained to, or failed to, take objectively reasonable steps to address J.C.P.'s family and foster placement or J.C.P.'s medical needs in that foster placement. Hall's failure to raise disputed fact issues material to determining whether the statutory obligations were violated, or whether the TDFPS employees were objectively unreasonable in meeting those obligations, defeats Hall's claim.

The individual-capacity claims under state law arising from the identical facts and allegations fare no better.  Under the TTCA, "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit."  TEX. CIV. PRAC. & REM. CODE § 101.106(e).  The section allows immediate dismissal on the state's motion for all claims.  *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 462–463 (5th Cir. 2010) (citing *Mission Consol. Sch. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 658–59 (Tex. 2008)).  The TDFPS defendants have moved for dismissal of all state common-law claims against the TDFPS employees.  (Docket Entry No. 74, pp. 30–31).  The motion is granted.

The state-law statutory claims must also be dismissed.  Government officials in Texas are entitled to official immunity, which is "substantially the same as federal qualified immunity law."  *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997).  An official performing a discretionary duty in good faith is not personally liable to a plaintiff.  *McIntosh v. Partridge*, 540 F.3d 315, 326 (5th Cir. 2008); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).  An official acts in good faith when "reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred."  *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004).

The statutory claims include those asserted in Counts XI and XIII.[8]  Count XI alleges violations of  TEX. FAM. CODE 264.1071 by Dixon, Lasco, Smith, and Halsey.  Count XIII alleges that Hall violated TEX. FAM CODE 264.007(c) and TEX. HUM. RES. CODE § 40.002.  Official immunity defeats claims under each section.

---

[8]   Hall also alleged violations of TEX. FAM. CODE § § 264.106(b) and TEX. HUM. RES. CODE 42.042 in Count X, but those claims, which pursued only declaratory and injunctive relief, have been dismissed for lack of standing.

The complaint alleges that Dixon, Lasco, Smith, and Halsey "failed to provide for the care and protection and physical and mental welfare," in violation of TEX. FAM. CODE § 264.1071.  This section provides:

> In making a placement decision for a child under two years of age, the department shall:
>
> (1) ensure that the child is placed with a person who will provide a safe and emotionally stable environment for the child; and
>
> (2) give priority to a person who will be able to provide care for the child without disruption until the child is returned to the child's parents or the department makes a permanent placement for the child.

TEX. FAM. CODE § 264.1071.  The complaint alleges a violation of subsection 1, not 2.  No case has defined the duties under this section.  The statutory text, however, focuses on making the placement decision for a young child, not with subsequent responsibilities.  The uncontroverted evidence shows that TDFPS contracted with Lutheran Social Services to place J.C.P.  Hall has pointed to no authority suggesting that the TDFPS cannot contract with other entities in arranging placements.  Nor has Hall pointed to any evidence that a TDFPS employee had any basis to believe that Lutheran Social Services would not place J.C.P. in a safe home.

Count XIII's claims are asserted against James for violating TEX. FAM CODE 264.007(c) and TEX. HUM. RES. CODE § 40.002 by failing to ensure that TDFPS fulfilled its duties under its contract with the federal government.  Section 40.002 of the Human Resources Code requires TDFPS to "cooperate with the federal government in the administration of programs under . . . Parts B and E, Title IV, federal Social Security Act (42 U.S.C. Sections 620 *et seq.* and 670 *et seq.*) . . . and . . . other federal law for which the department has administrative responsibility."  *Id.* § 40.002(c). Section 264.007 of the Family Code provides:

> The department is the state agency designated to cooperate with the

United States Department of Health and Human Services in:

(1) establishing, extending, and strengthening public welfare services for the protection and care of abused or neglected children;

(2) developing state services for the encouragement and assistance of adequate methods of community child welfare organizations and paying part of the cost of district, county, or other local child welfare services in rural areas and in other areas of special need; and

(3) developing necessary plans to implement the services contemplated in this section and to comply with the rules of the United States Department of Health and Human Services under the federal Social Security Act (42 U.S.C. Section 651 *et seq.*).

Hall has not cited any case in which these provisions form the basis of individual tort liability. Hall has not identified or presented any summary judgment evidence of specific acts or omissions by the TDFPS employees that violated these general statutory requirements and were unreasonable. Summary judgment is granted as to the state statutory claims against the TDFPS employees based on immunity.

Finally, the complaint asserts a common-law breach-of-contract claim against James for failing to enforce the provisions of TDFPS's contract with the federal government, to which J.C.P. is an intended beneficiary. Even assuming, without deciding, that J.C.P. was an intended third-party beneficiary of the contract, this claim fails because government employees are not liable on contracts between the government and a third party. *See Holdzapple v. AFEX Corp.*, No. 03-96-00273-CV, 1997 WL 528927, at * 2–4 (Tex. App.—Austin 1997) (allowing claim to proceed against government employees because facts did not preclude finding that contract was entered into in their individual capacities, not as agents of the government); *City of Houston v. First City*, 827 S.W.2d 462, 480 (Tex. App.—Houston [1 Dist.] 1992) ("It has long been the established rule in Texas that where an agent acts on behalf of a disclosed principal, as in the case here, and within the scope of

the authority conferred on him, it will not ordinarily be personally liable to the other party to the contract, in the absence of an agreement to the contrary or other circumstances showing that he has, either expressly or impliedly, assumed such liability."). And even if James was personally bound to the contract, there is, as noted in the discussion of the statutory claims, no evidence that any of James's actions that could be considered part of that contract were unreasonable so as to defeat immunity.

The complaint and record evidence do not raise a fact issue as to the liability of the TDFPS or its employees for the federal or state law claims alleged. Summary judgment is granted dismissing the claims against TDFPS and its employees with prejudice.

### C.    The Motions Filed By Community Health Choice

Community Health Choice was Hall's insurer. The amended complaint accuses Community Health Choice of common-law negligence and asserts a statutory negligence claim under TEX. CIV. PRAC. & REM. CODE § 88.002. (Docket Entry No. 22, Count II). Community Health Choice has filed three motions to dismiss. (Docket Entries No. 38, 43, 57). Community Health Choice argues that it is immune from suit on both the statutory and common-law negligence claims because it is a charitable entity created by a public health-care corporation, the Harris County Hospital District. Community Health Choice also argues that the complaint fails to state a claim on which relief can be granted and alternatively that it is entitled to a more definite statement.[9] At a hearing on February 8, 2010, this court granted Hall forty-five days to amend her complaint to avoid the hurdle presented

---

[9]    Community Health Choice also moves for dismissal due to sovereign immunity under Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction. Whether Community Health Choice is entitled to immunity under the Eleventh Amendment is a question of federal law, evaluated under a six-factor test. *See Delahoussaye v. City of New Iberia*, 937 F.2d 144, 147 (5th Cir. 1991). Community Health Choice has not, however, argued any of these factors, making it appropriate to treat the motion as seeking dismissal for failure to state a claim under Rule 12(b)(6) under the applicable state law.

by Community Health Choice's immunity based on its status as a charitable entity. On April 8, Hall presented a new theory of liability. (Docket Entry No. 105). She alleges that Community Health Choice violated the TEX. INS. CODE §§ 541.060, 504.061, by making its coverage for a second medical opinion on whether J.C.P. should have a tracheostomy dependent on an "impossibility" and by misleading her about insurance coverage for the second opinion. Hall alleges that any charitable-entity immunity is waived under TEX. HEALTH & SAFETY CODE § 281.051, which requires entities formed under that section to comply with TEX. INS. CODE Ch. 843, which in turn requires compliance with TEX. INS. CODE Ch. 541. Second, Hall alleges that these statutory obligations on Community Health Choice were incorporated into its contract with the Texas Health and Human Services Commission, a contract to which Hall and J.C.P. were third-party beneficiaries. Community Health Choice responds that this new theory is futile because the relevant statutes do not apply and do not waive its immunity.

The original theories of liability Hall pursued cannot stand. Community Health Choice argues that it is immune from liability as a charitable organization under TEX. HEALTH & SAFETY CODE § 281.0565, which provides as follows:

> (a) In this section, "charitable organization" means an organization that is exempt from federal income tax under Section 501(a) of the Internal Revenue Code of 1986 by being listed as an exempt organization in Section 501(c)(3) or 501(c)(4) of the code.
>
> (b) A district may create a charitable organization to facilitate the management of a district health care program by providing or arranging health care services, developing resources for health care services, or providing ancillary support services for the district.
>
> (c) A charitable organization created by a district under this section is a unit of local government for purposes of Chapter 101, Civil Practice and Remedies Code.

In support of its motion, Community Health Choice submitted its articles of incorporation and those

of the Harris County Hospital District, which show that Community Health Choice is a charitable organization organized by a qualifying district. (Docket Entry No. 57, Exs. A, B). Community Health Choice is a "unit of local government for the purposes of Chapter 101, Civil Practice and Remedies Code," the TTCA. TEX. HEALTH & SAFETY CODE § 281.0565(c).

The parties have provided no case law interpreting § 281.0565(c), but its plain language treats a qualifying charitable entity as a unit of local government under the TTCA. The TTCA provides immunity to units of local government. *See Garcia*, 253 S.W.3d at 658 (construing election of remedies provision allowing dismissal of government employees for any suits "under this chapter" to apply to intentional torts, even though intentional tort liability is not waived by the TTCA). Failure to pay for a second opinion is not within the TTCA's limited waiver of immunity. The common-law negligence claim against Community Health Choice must be dismissed.

Community Health Choice also contends that § 281.0565(c) gives it immunity for its alleged violation of TEX. CIV. PRAC. & REM. CODE § 88.002. Under that section, a:

> health insurance carrier, health maintenance organization, or other managed care entity for a health care plan has the duty to exercise ordinary care when making health care treatment decisions and is liable for damages for harm to an insured or enrollee proximately caused by its failure to exercise such ordinary care.

TEX. CIV. PRAC. & REM. CODE § 88.002(a). Community Health Choice argues that it is not subject to liability under this provision because there is no sovereign immunity waiver. Under Texas law, courts will not find a waiver of immunity unless it is "express." *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) (citing TEX. GOV'T CODE § 311.034 (requiring a "clear and unambiguous" waiver)); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003) (outlining four factors relevant to whether a statute waives immunity). Section 88.002(a) contains no language suggesting a waiver of state immunity. As with the its argument against common-law negligence liability,

Community Health Choice's argument is based on its status as a unit of local government under the TTCA.  For the same reasons, this court concludes that Community Health Choice is immune from suit.  Hall's claim under TEX. CIV. PRAC. & REM. CODE § 88.002 is dismissed.

Hall's proposed new theory of liability is based on alleged violations of TEX. INS. CODE §§ 541.060, 541.061, which proscribe certain unfair insurance practices.  These statutes apply to Community Health Choice, she argues, because TEX. HEALTH & SAFETY CODE § 281.051 requires entities formed under the section to comply with TEX. INS. CODE Ch. 843, which requires compliance with TEX. INS. CODE Ch. 541, including §§ 541.060 and 541.061.  She argues that these provisions are incorporated into a contract between Community Health Choice or its "parent" entity, Harris County Hospital District, and the Texas Health and Human Services Commission, and that she and J.C.P. are third-party beneficiaries of this contract.  But Hall points to no authority suggesting that §§ 541.060 and 541.061 themselves abrogate sovereign immunity.  The provision that prohibits unfair practices reads:

> A person may not engage in this state in a trade practice that is defined in this chapter as or determined under this chapter to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

TEX. INS. CODE § 541.003.  Under Texas law, statutes regulating the acts of any "person" do not waive sovereign immunity "unless the context of the statute indicates no other reasonable construction."  TEX. GOV'T CODE § 311.034.  Nothing in this language suggests that the statute waives sovereign immunity.

For the proposition that Community Health Choice and the Harris County Hospital District can be sued in contract, Hall points to TEX. HEALTH & SAFETY CODE §§ 281.001, 280.047 & 281.056(a).  These sections give a hospital district the right to enter into contracts with the

58

permission of its board and to "sue and be sued" in state courts.  The Texas Supreme Court has held

that the legislature's decision to give the a hospital district the authority to sue and be sued does not

operate as a general immunity waiver.  *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d

838, 843 (Tex. 2009); *see also Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, — S.W.3d —,

2010 WL 3366104, at *5–6 (Tex. Aug., 27, 2010) (holding that a similar sue-and-be-sued clause did

not allow suit for contractual damages).  Hall's motion for leave to amend to assert these additional

claims against Community Health Choice is denied as futile.  *Ayers*, 247 F. App'x at 535.

Even if the immunity were waived, the complaint's allegations are insufficient to survive

dismissal under Rule 12(b)(6).  Hall alleges that she is a third-party beneficiary of Community

Health Choice's contract with the Texas Health and Human Services Commission.  That is all she

alleges.  Her motion states: "Hall and Jasmine were third-party beneficiaries of the contract between

CHC and THHSC."  (Docket Entry No. 105, p. 4).  "A pleading that offers 'labels and conclusions'

or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949

(quoting *Twombly*, 550 U.S. at 555); *see also Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x

474, 476 (2d Cir. 2006) ("Citadel's pleading of . . . beneficiary intent is merely a legal conclusion

that the district court was not obliged to credit at the pleading stage.").  The claims in Count II

against Community Health Choice are dismissed.

### D.    The Motions Filed By Memorial Hermann Hospital System

Memorial Hermann moves to dismiss the § 1983 claim asserted in Count IV for violation of

the right to family integrity on the ground that because the hospital is not a state actor.  Section 1983

only protects against violations by state actors.  *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241 (5th Cir.

1999).  A private entity's acts are not taken "under color of state law" unless they are "fairly

attributable to the state."  *Id.*  The Supreme Court has formulated the test for state action in four

different ways: public function; nexus; state compulsion; and joint action.  *Id.* at 241–42.  The Court

has not, however, resolved "[w]hether these different test are actually different in operation or

simply different ways of characterizing this necessarily fact-bound inquiry . . . ."  *Lugar v.*

*Edmondson Oil Co.*, 457 U.S. 922, 939 (1982).

Hall alleges that Memorial Hermann used state-created procedures to make a false report of

neglect and acted in concert with TDFPS to deprive her of the right to decide what medical treatment

J.C.P. received.  This fits most closely the state-compulsion test.  The alleged use of state-created

procedures, however, is insufficient to allege state action.  "The state's mere acquiescence in private

conduct, *even when authorized by statute*, will not transform that conduct into state action."  *Bass*,

180 F.3d at 242 (emphasis added.).  Only when a state "has exercised coercive power or has

provided such significant encouragement . . . that the choice must in law be deemed to be that of the

State" does a private entity's action become state action.  *Id.* (quoting *Blum v. Yaretsky*, 457 U.S.

991, 1004 (1982)).  Without allegations of a high level of state compulsion or encouragement,

Memorial Hermann's actions cannot be attributed to the state.

In her response, Hall points out Texas law requires "doctors to report suspected neglect and

abuse observed in [their] patients."  *See* TEX. FAM. CODE 261.001(4)(B)(ii) (requiring doctors to

report parental failures to "follow through with medical care for a child" that creates certain risks

for the child).  Making a report required by state law does not make that report state action or the

entity making the report a state actor.  And state law does not require, encourage, or permit a

hospital to make a false report.  *See* TEX. FAM. CODE § 261.106(c) ("A person . . . who acts in bad

faith or with malicious purpose in reporting alleged child abuse or neglect is not immune from civil

or criminal liability.").

Hall's allegation of joint action is also insufficient.  The complaint alleges that TDFPS

employees received and acted on the hospital's report of neglect when Hall refused repeatedly to consent to the tracheostomy.  The complaint alleges that Memorial Hermann personnel participated as witnesses in the proceedings that resulted in temporarily terminated Hall's custody of J.C.P. to allow the hospital to perform the tracheostomy.  These allegations may claim that TDFPS failed adequately to investigate Hall's actions before pursuing the temporary custody termination.  But these allegations do not state any basis for joint action that could make the hospital a state actor subject to liability under § 1983.

Hall's § 1983 claim fails for an additional reason.  She has alleged that individual employees or doctors at the hospital made a false report of neglect.  But § 1983 does not allow a state actor to be held liable for the acts or omissions of employees under a respondeat superior theory.  To show liability for a violation of a federal right committed by an employee or agent, a plaintiff must satisfy three elements: (1) a custom or policy (2) attributable to a policymaker (3) that was the "moving force" behind the alleged rights violation.  *Valle*, 613 F.3d at 541–42.  A custom or policy is not the "moving force" behind a civil rights violation unless the policymaker was deliberately indifferent to the risk of the violation that occurred.  *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 411 (1997)).  "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'"  *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).  Prior alleged violations showing the policymaker to be deliberately indifferent must be similar to the alleged violation at hand.  *See Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005) ("Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question. That is, notice of a pattern of similar violations is required.") (footnotes omitted).  To survive a motion to dismiss, "[t]he description of the policy or custom and its relationship to the underlying

61

constitutional violation . . . must not be conclusory; it must contain specific facts." *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997). The same rules apply to private corporations accused of § 1983 violations. *Meade v. Dillard Dep't Stores*, No. 00-51223, 2001 WL 1223752, at *2 n.3 (5th Cir. Oct. 4, 2001) (citing *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992) ("[E]very circuit to consider the issue has extended the holding to private corporations as well.")); *see also Lux ex rel. Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

It is clear from the complaint the only theory asserted is for respondeat superior liability. "Memorial Hermann is being sued for damages under both state and federal laws based on the actions of . . . employees, independent contractors, or agents of Memorial Hermann Hospital System acting in the course and scope of the employment or contractual relationship." (Docket Entry No. 22, ¶ 8). The complaint describes no specific policy, identifies no policymaker, and describes no previous false reports of neglect. Counts I and IV are dismissed as to Memorial Hermann.

The complaint alleges in Count I that for the same reasons asserted in the § 1983 claims, Memorial Hermann is liable for negligence under Texas common law and for medical malpractice under TEX. CIV. PRAC. & REM. CODE § 74.001 *et seq.* The complaint alleges in Count IV that Memorial Hermann violated Hall's and J.C.P.'s right to family integrity. Memorial Hermann moves to dismiss under Rule 12(c).

Count I alleges that Memorial Hermann's acts of negligence and malpractice included harassing Hall, "failing to provide accurate, consistent, easily understood advice to assist [her] in making an informed decision," and not offering a "timely method of resolving her dispute with [the] hospital" over having a tracheostomy performed on J.C.P. (Docket Entry No. 22, ¶¶ 158–160). Hall

62

alleges that as a result, she suffered "emotional distress and costs to defend the allegations against her including attorney's fees and lost compensation." (*Id.*, ¶ 161).

Memorial Hermann argues that the claim for negligent infliction of emotional distress should be dismissed because Texas law does not recognize this cause of action. *See Boyles v. Kerr*, 88 S.W.2d 593, 594 (Tex. 1993) ("We hold that there is no general duty in Texas not to negligently inflict emotional distress. A claimant may recover mental anguish damages only in connection with defendant's breach of some other legal duty."). In reply, Hall concedes that she cannot sue for negligent infliction of emotional distress and withdraws the claim. (Docket Entry No. 104, p. 5). That part of the motion to dismiss is granted. But Hall also argues that the complaint states a claim for intentional infliction of emotional distress, which is actionable under Texas law. *See Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex. 1993) (adopting the theory of intentional infliction of emotional distress and setting out the elements). The elements of an IIED claim are that "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Id.* at 621. A plain reading of Count I of the complaint defeats the argument that it alleges an IIED claim. Count I is clearly labeled "Negligence." There is no reference to, or description of, any acts that are extreme and outrageous. *See id.* (requiring that the "conduct [be] extreme and outrageous"). The complaint does not allege an IIED claim and Hall has not asked to amend her complaint to do so.

In addition to compensation for her distress, Hall also requests compensation for the costs she incurred defending the custody proceedings. The complaint does not allege that failures to communicate treatment options proximately caused the custody termination. The report of neglect, alleged to be negligently made, does not defeat the immunity for good-faith reports of neglect under

Texas law.  *Thapar v. Zezulka*, 994 S.W.2d 635, 639–40 (Tex. 1999) (citing TEX. FAM. CODE § 261.106).

Hall also contends that Count I of the complaint states a cause of action for breach of contract against Memorial Hermann.  The complaint contains no allegation of a contract, much less a breach.  And Hall has not sought leave to amend to allege a breach of contract claim against Memorial Hermann.

The state-law claims against Memorial Hermann are dismissed.

### D.     The Motions Filed By Lutheran Social Services

The complaint names Lutheran Social Services in Counts X and XV, and XVII.  Count X has been dismissed for lack of standing.  In Count XV, Hall alleges that Lutheran Social Services breached its contract with TDFPS; that J.C.P. was a third-party beneficiary of that contract; and that the breach denied J.C.P. her right to receive care in accordance with TEX. HUM. RES. CODE § 40.002 and TEX. FAM. CODE 264.007(c).  In Count XVII, the complaint alleges that Lutheran Social Services knew or should have known of the "grave risk of harm to [J.C.P.] as a result of her placement in the home of Cochran and as a result of the negligent care of Cochran." Lutheran Social Services argues that the complaint is deficient under Rule 8 and must be dismissed under Rule 12(b)(6).

Before analyzing the Rule 12(b)(6) motion, the challenge to subject matter jurisdiction should  be addressed.  Lutheran Social Services asserts that this court lacks subject-matter jurisdiction over it because Hall has asserted only state law claims against this defendant.  As a general rule, when a district court's jurisdiction is based on a federal question—such as Hall's § 1983 and federal statutory claims against other defendants—the court has supplemental jurisdiction "over all other claims that are so related to the claims in the action [providing the federal question]

that they form part of the same case or controversy under Article III."  28 U.S.C. § 1367(a).  "The question under section 1367(a) is whether the supplemental claims are so related to the original claims that they form part of the same case or controversy, or in other words, that they 'derive from a common nucleus of operative fact.'"  *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).  This standard applies when the supplemental claims "involve the joinder or intervention of additional parties."  28 U.S.C. § 1367(a); *see also* 13D CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER & RICHARD D. FREER, FEDERAL PRACTICE & PROCEDURE § 3567.1, at 365 (3d ed. 2008)  ("The fact that the claim involves a party as to whom there is no claim that invokes an independent basis of subject matter jurisdiction is irrelevant.").  Lutheran Social Services makes no argument that the allegations against it arise from a different transaction or occurrence than the federal claims. Because supplemental jurisdiction extends to state-law claims that arise from the same transaction or occurrence as the federal claims against other parties, this court has subject-matter jurisdiction over the claims against Lutheran Social Services.[10]

Like the allegations that J.C.P. is a third-party beneficiary of a Memorial Hermann contract, Count XV contains only a bare-bones allegation that J.C.P. is "an intended third-party beneficiary" to a Lutheran Social Services contract.  Such a conclusory allegation is insufficient.  Count XV is dismissed.

Lutheran Social Services is also entitled to dismissal of the negligence claim against it in Count XVII.  The complaint alleges that "Lutheran Social Services . . . knew or should have known

---

[10]    In responding to Lutheran Social Service's motion to dismiss, Hall argues that she "inadvertently omi[tted]" a § 1983 claim against Lutheran Social Services.  Insofar as this is an request for leave to amend, it is denied as futile.  There is no suggestion of any basis to assert such a claim against Lutheran Social Services, and Hall does not identify one.

that, in addition to being responsible for the care of two other special needs children, Cochran worked outside of the home and maintained a schedule that prevented her from providing the direct, continuous observation required based on [J.C.P's] condition and level of care." (Docket Entry No. 22, ¶¶ 137, 150). The complaint alleges that J.C.P.'s tracheostomy tube detached while Cochran was "documenting paperwork." But the complaint allegations themselves show no basis to infer any causal connection between these alleged deficiencies and J.C.P.'s death. The complaint alleges that Cochran was at home with J.C.P., doing paperwork, when the tube became detached. The facts alleged, taken as true, show that Cochran was not distracted by the need to care for another child and was not away from home when the tracheostomy tube dislodged. The complaint fails to allege proximate cause.

### E.    The Motion to Dismiss Filed By the *Ad Litem* Defendants

Sanchez, Child Advocates, and Rhodes were all involved in the *ad litem* process on behalf of J.C.P. Rhodes served as the attorney *ad litem*. (Docket Entry No. 67, Ex. 4). Child Advocates was appointed by the juvenile court to serve as guardian *ad litem*, a role actually filled by a volunteer, Kathi Warne.[11] (Docket Entry No., 65, Ex. B). Sanchez is the advocacy coordinator for Child Advocates and supervised Warne. The complaint names the three in Count VII (which asserts a violation of the Texas constitutional right to due process), Count VIII (which asserts a violation of J.C.P.'s federal right to a safe foster home environment), Count XI (which asserts a violation of the state statutory right to a safe environment), and Count XVII (which asserts negligence). Rhodes is also named in Count XIV (which alleges breach of the mediated settlement agreement). Counts VII and XI have been dismissed for lack of standing.

---

[11]    In the court filings, the parties also spell this individual's last name "Warne."

66

This court previously allowed Hall to replead her claims against Rhodes.  In her amended complaint, Hall has added claims under § 1983 for violations of Hall and J.C.P.'s federal due process rights, the Federal Adoption Assistance Act, and procedural due process; for breach of fiduciary duty under Texas law; and for statutory violations relating to the adequacy of his representation of J.C.P. as the attorney *ad litem*.

The *ad litem* defendants argue that this court should dismiss the claims against them for lack of subject-matter jurisdiction under the *Rooker-Feldman* doctrine because this suit is simply an attack on the state-court judgment removing J.C.P. from Hall's custody.  Alternatively, they argue that collateral estoppel applies because the issues were already litigated in state court.  These defendants also argue that immunity protects them from liability.  For the reasons explained below, *Rooker-Feldman* does not deprive this court of jurisdiction but the defendants are immune from liability for all Hall's claims.  As a result, the collateral estoppel argument need not be resolved.

### 1.    The *Rooker-Feldman* Doctrine and Jurisdiction

The *ad litem* defendants argue that this court lacks subject-matter jurisdiction to hear the claims against them under the *Rooker-Feldman* doctrine.  They argue that the state-court proceedings, which removed J.C.P. from Hall's custody, are the source of the injuries Hall and J.C.P.'s injuries.  Rhodes in particular argues that the state court approved the mediated settlement agreement that Hall entered into, making findings as to the best interests of the child and the obligations of the *ad litems*, and that Rhodes complied with the order based on the mediated settlement agreement.

*Rooker-Feldman* prevents state-court litigants "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."  *Johnson v. De Grandy*, 512

U.S. 997, 1005–06 (1994).  The rule derives from 28 U.S.C. § 1330, which limits district-court jurisdiction to cases in which federal courts have original jurisdiction, and § 1257, which gives the Supreme Court jurisdiction to hear appeals from a state's highest court.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 290–91 (2005).  For *Rooker-Feldman* to apply, four conditions must exist: "1) the case must be brought by a state court loser; 2) the injury alleged must be caused by the state court judgment; 3) the judgment must have been rendered before the district court proceedings commenced; and 4) the case must invite district court review and rejection of that judgment."[12]  In *Exxon*, the Court clarified that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Id.* at 284.

Exxon made clear that *Rooker-Feldman* applies only when a previously rendered state-court judgment is the target of the federal court proceedings.  The Supreme Court was explicit on this point: "Nor does [*Rooker-Feldman*] stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."  *Id.* at 283 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)) (quotation marks and alterations

---

[12]   Allison B. Jones, Note, *The* Rooker-Feldman *Doctrine: What Does It Mean to Be Inextricably Intertwined?*, 56 DUKE L.J. 643, 674 (2006); *accord Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, — F.3d —, 2010 WL 3035466, at *6 (3d Cir. 2010).

omitted).   Claim preclusion applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."   RESTATEMENT (SECOND) OF JUDGMENTS § 27.   *Rooker-Feldman* differs from claim preclusion in that attack on the prior state-court judgment is an attempt to invalidate it, as opposed to achieving an inconsistent resolution of the issues.   Before *Exxon*, courts often invoked *Rooker-Feldman* as a basis for dismissing a federal case that was "inextricably intertwined" with an issue determined in a state-court case.   *See Feldman*, 460 U.S. at 486.   Courts and commentators since *Exxon* have concluded that that the "inexplicably intertwined" language does not create a separate avenue to dismissal.   *See Great W. Mining & Mineral Co.*, 2010 WL 3035466, at *9 ("The phrase "inextricably intertwined" does not create an additional legal test or expand the scope of *Rooker-Feldman* beyond challenges to state-court judgments."); *McCormick v. Braverman*, 451 F.3d 382, 394 (6th Cir. 2006) ("In *Exxon*, the Supreme Court implicitly repudiated the circuits' post-*Feldman* use of the phrase 'inextricably intertwined' to extend *Rooker-Feldman* to situations where the source of the injury was not the state court judgment."); Jones, *supra*, at 674–78 (questioning whether "inextricably intertwined" retained any force after *Exxon*).

Post-*Exxon*, the key to determining when *Rooker-Feldman*, as opposed to preclusion, applies is the source of the injury.   The doctrine only applies if the injury's source is the state-court decision.   *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 87 (2d Cir. 2005) (describing this as the "core requirement from which the others derive").   The Second Circuit helpfully illustrated the line between preclusion and *Rooker-Feldman*:

> Suppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in federal court, he will be seeking a

> decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination. The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker-Feldman*, of the state-court judgment.

*Id.* at 87–88. By contrast,

> [s]uppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments.

*Id.* at 87. The court explained that "clever pleading" cannot save a plaintiff's case in such a situation: "if the state has taken custody of a child pursuant to a state judgment, the parent cannot escape *Rooker-Feldman* simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child. The example shows that in some circumstances, federal suits that purport to complain of injury by individuals in reality complain of injury by state-court judgments. The challenge is to identify such suits." *Id.* at 88.

The presence of a state-court decision as a necessary part of the injury is not enough to divest the federal court of jurisdiction if there is some independent wrong charged against the defendant. For example, in *Nesses v. Shepard*, the Seventh Circuit considered allegations that the judges and attorneys had conspired against him in a state-court case. 68 F.3d 1003, 1004 (7th Cir. 1995). The court acknowledged that the plaintiff was "in a sense attacking the ruling by the state court." *Id.* Without the state court adverse ruling, he would have suffered no injury. *Id.* at 1005. Yet the

70

federal court had jurisdiction because the complaint alleged that "people involved in the decision violated some independent right of his, . . . the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics." *Id.* The court pointed out that a contrary result would have the perverse result of rewarding those who successfully corrupt or otherwise undermine state-court proceedings. Relying on *Nesse*, the Seventh Circuit has twice rejected defendants' arguments that the federal courts lacked jurisdiction over federal cases involving rulings in state-court child-custody disputes. *See Brokaw v. Weaver*, 305 F.3d 660, 667–69 (7th Cir. 2002) (allowing claim of conspiracy to falsely report child abuse); *Jensen v. Foley*, 295 F.3d 745 (7th Cir. 2002) (holding that the injury in a federal suit against officers enforcing a child-custody order was "was caused not by the state court's temporary custody order, but by the underlying taking by the . . . officers").

Under these principles, *Rooker-Feldman* does not deprive this court of subject matter jurisdiction over Hall's claims against the *ad litem* defendants. The complaint is not limited to claims that Hall and J.C.P. were injured as a result of the state-court custody and related orders. Counts VII, VIII, IX, XI, and XIV charge the *ad litem* defendants with infractions independent of the state court's decisions on J.C.P.'s care. Paragraph 125 of the complaint, for example, alleges that Hall and Sanchez made "untrue and irrelevant" accusations against Hall and investigated inadequately. Nor does the complaint seek to overturn the state-court judgment entering the settlement agreement. Instead, the complaint alleges that the judgment, which enforced the settlement agreement, was violated in that the agreement was breached. *See Hoblock*, 422 F.3d at 87–88. While the state court's decisions are part of the causal chain that connects the *ad litem* defendants' alleged deficient performance to J.C.P.'s and Hall's injuries, that is not enough to trigger *Rooker-Feldman. See, e.g.*, *Nesses*, 68 F.3d at 1005. The *ad litem* defendants' arguments are at most an argument for preclusion.

71

The *ad litem* defendants cite *Page v. Sage*, Civ. A. No. 6:06-CV-409 (E.D. Tex. Apr. 3, 2007).  In that case, the parents sued "anyone and everyone involved with the . . . investigation and state court proceedings" that led to their losing custody of their daughter.  *Id.*, slip op. at 2–3.  The court dismissed the plaintiffs' claims of "violations of their constitutional and civil rights by judges, individuals, agencies, and entities . . . pertain[ing] to the state custody proceeding of [their children], which was decided a final judgment."  *Id.*, slip op. at 5.  The reason for dismissal was not the kind of claims brought but rather the kind of relief sought.  The plaintiffs argued that the state-court orders were "void because they lacked jurisdiction and did violate [the plaintiffs'] constitutional rights," and asked the federal court to order "that the judgment in the state proceeding be set aside." *Id.*  As the court in that case correctly concluded, it was "simply not a matter that this federal court may properly entertain."  *Id.*  The result was not to dismiss the entire case.  Instead, the Fourth Amendment claims against the police officers who seized the child went forward, because they "did not involve the state-court proceeding and judgment." *Id.* at 9.[13]  The result in *Page* is consistent with this court's conclusion that subject-matter jurisdiction exists here.  Hall does not ask this court to overturn the state-court judgment or orders.[14]  As explained below, however, although *Rooker-*

---

[13]   To the extent that the court in *Page* relied on claims' "involve[ment]" with the state-court proceedings, as opposed to an attack on the proceedings' judgment, this court disagrees with the analysis and follows the approach taken by the Second and Third Circuits post-*Exxon*.

[14]   A recent Seventh Circuit decision, *Golden v. Helen Sigman & Assocs., Ltd.*, 611 F.3d 356 (7th Cir. 2010), is also instructive.  In that case, a jilted ex-husband sued "anyone who advocated for" his ex-wife, including the court-appointed representative for their child.  *Id.* at 359.  He accused her of making a false report of child abuse "in an effort to assist [his ex-wife's] claim for child custody."  *Id.* at 359.  The child representative sought absolute immunity.  The court declined to reach that issue because it determined that *Rooker-Feldman* applied.  *Id.* at 3651–62.  Focusing on *Exxon*'s statement that the "doctrine prevents a party 'complaining of an injury caused by [a] state-court judgment' from seeking redress in a lower federal court,'" the court concluded that "Golden ha[d] not suffered a procedural harm separate and independent from the state court's custody determination."  *Id.* at 362 (quoting *Exxon*, 544 U.S. 291–92).  But the injury from the state-court judgment in *Golden* is not in a significant sense distinguishable from the injury that flows from state-court judgments that are the basis of federal legal malpractice claims.  The court in *Golden* did not

*Feldman* does not apply, immunity does.

### 2.    Immunity

The complaint alleges violations of federal constitutional and statutory rights under § 1983 by Rhodes, Sanchez, and Child Advocates.  These defendants move for dismissal on the basis of absolute and qualified immunity.

The defendants first assert derived judicial immunity.  Derived judicial immunity protects from suit all who are "integral parts of the judicial process."  *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983).  Following *Briscoe*, numerous courts, starting with the Sixth Circuit in *Kurzawa v. Mueller*, have held that guardians *ad litem* are absolutely immune from suit under § 1983.  732 F.2d 1456, 1458 (6th Cir. 1984); *see also Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009) (citing *Kurazawa*, 732 F.2d at 1458); *Fleming v. Asbill*, 42 F.3d 886, 889 (4th Cir. 1994) ("A line of Supreme Court Cases holds that judges, prosecutors, witnesses and other actors in the judicial process are immune from § 1983 . . . liability for misfeasance of their duties.").  The rationale is that the guardian *ad litem* is appointed by the court to "act in the best interests of the child he represents." *Kurzawa*, 732 F.2d at 1458.  Such a position clearly places him squarely within the judicial process to accomplish that goal.  A guardian *ad litem* must also be able to function without the fear of possible later harassment and intimidation from dissatisfied parents." *Id.*  This is consistent with the Fifth Circuit's approach to absolute immunity, which uses a "'functional approach' that focuses on 'the nature of the function performed, not the identity of the actor who performed it.'" *In re*

---

explain how the injury in that case differed from the injury at issue in the earlier cases in which the courts found that *Rooker-Feldman* did not apply.  The court held in the alternative that the state court's resolution of the issues precluded Golden from asserting his claim.  *Exxon* focused on the distinction between *Rooker-Feldman* and preclusion, emphasizing that the former only applies if there is an attack on the state-court judgment itself.  The court in *Golden* did not explain how the distinction applied in that case.

*Foust*, 310 F.3d 849, 855 (5th Cir. 2002) (quoting *Thomas v. City of Dallas*, 175 F.3d 358, 362 (5th Cir. 1999)).  The rationale applies to Rhodes, the attorney *ad litem*.

Rhodes argues that the § 1983 claims against him should be dismissed  because he did not act "under color of state law."  As set forth more fully in the discussion of Memorial Hermann's motion to dismiss, private actors are not liable under § 1983.  The leading relevant Supreme Court case is *Polk County v. Dodson*, 454 U.S. 312 (1981), holding that a public defender does not act under color of state law merely by virtue of the position.  The Court began its analysis with the observation that "a person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Id.* at 317–18 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  The Court acknowledged that the source of the attorney's paycheck was "certainly a relevant factor," but held that the public defender did not act under color of state law simply by virtue of his position, because public defenders, unlike other state employees, have independent professional obligations to their clients.  *Id.* at 321.  Following *Dodson*, courts have held that guardians and attorneys *ad litem* are not state actors merely by virtue of their positions.  *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir. 2003) (per curiam) (holding that duty to child meant *ad litem* did not act under color of state law solely by virtue of being appointed); *Meeker v. Kercher*, 782 F.2d 153, 155 (10th Cir. 1986) (same); *Parkell v. South Carolina*, 687 F. Supp. 2d 576, 587 (D. S.C. 2009) ("Guardians ad litem are not state actors for purposes of § 1983, because they give their 'undivided loyalty to the minor, not the state.'"); *Nelson v. Kujawa*, No. 07-C-741, 2008 WL 2401260, at *2 (E.D. Wis. June 11, 2008) ("[S]tate-appointed guardians ad litem are not state actors subject to liability under 42 U.S.C. § 1983."); *Schiavo ex rel. Schindler v. Schiavo*, 358 F. Supp. 2d 1161, 1164–65 (M.D. Fla. 2005) ("Contrary to Plaintiffs' argument, Michael Schiavo, as court appointed guardian for Theresa

74

Schiavo, was not acting under color of state law."); *Chrissy F. ex rel. Medley v. Miss. Dep't of Public Welfare*, 780 F. Supp. 1104, 1116 (S.D. Miss. 1991), *rev'd on other grounds*, 995 F.2d 595 (5th Cir. 1993).  But, as Hall points out, the cases also suggest that attorneys *ad litem* could be state actors if the actions show an alignment with the state rather than the client.  *Kirtley*, 326 F.3d at 1095; *Meeker*, 782 F.2d at 155.

In the complaint, Hall alleges that Rhodes was driven by his "loyalty to the judge and the state."  (Docket Entry Nol. 111, ¶¶ 23).  Hall alleges that the state-court judge was a "long time friend" of Rhodes and that the judge entered findings of fact and conclusions of law that Rhodes drafted as "one last favor to a friend, continuing the pattern of bias and favoritism that has long been part of the 315th District Court of Harris County."  (*Id.*, ¶ 29).  In her brief, Hall alleges that "official and unofficial rules of the Harris County juvenile court appointment system" cause an *ad litem*'s "loyalty to be divided between his client and the state making them 'state actors' for purposes of § 1983."  (Docket Entry No. 110, p. 10).  Hall notes that the juvenile court judge appointed Rhodes and that he received compensation from the state for representing J.C.P.  She argues that lawyers such as Rhodes have a financial incentive to take a larger number of cases.  Acknowledging that an *ad litem* is appointed to represent the client's interests, not the state's, Hall argues that these systemic pressures nonetheless push lawyers such as Rhodes away from the client's interests and toward those of the state.  She also notes that the judges' dockets also provide an incentive for them to favor a speedy rather than a thorough resolution of cases.

The courts have held that such pressures and incentives do not present a basis to overcome immunity unless they rise to the level of state pressure on a private actor to act in a certain way.  In *Blum*, the Court emphasized that the compulsion test is met only when the state itself provides encouragement for a certain behavior.  *See* 457 U.S. at 1005.  Hall neither alleges nor describes any

75

such  state pressure.  Moreover, the pressures and incentives Hall alleges and describes are present in many court systems, state and federal, that rely on court-appointed lawyers for a variety of tasks, including providing a defense in criminal cases.  Courts have repeatedly found that a court-appointed lawyer is not a state actor for the purpose of § 1983.  *See Mills v. Criminal Dist. Court No. 3*, 837 F.2d 677, 679 (5th Cir. 1988) ("[P]rivate attorneys, even court-appointed attorneys, are not official state actors, and generally are not subject to suit under section 1983."); *see also Williams v. City of Dallas Police Dep't*, No. 3-09-CV-0275-P, 2009 WL 812239, at * 2 (N.D. Tex. March 26, 2009).  Hall's allegations fall far short of showing that Rhodes acted under color of state law.  Alleging these general pressures and incentives is insufficient to plead that Rhodes was aligned with the state or was a state actor for the purpose of § 1983 in his representation of J.C.P.

Hall also argues that Rhodes falls under § 1983 because he used state-court procedures to have J.C.P. removed from Hall's custody.  As explained  above, however, the alleged use of state-created procedures is not enough to subject the actions of a private individual to immunity based on § 1983.  *Bass*, 180 F.3d at 242.  The state must have coerced the private actor to act in a certain way and the complaint makes no such allegations.

Hall last argues that there is state action in the conduct of the *ad litem* defendants by virtue of a symbiotic relationship between Rhodes and TDFPS.  She asserts that Rhodes benefits by getting more cases and TDFPS benefits by getting a larger budget as its caseload expands.  The argument is insufficient for the reasons set out above.  These general incentives, assumed to be true, are present in a variety of institutional relationships and are too general to rise to the level of state pressure on a private actor that could overcome immunity or make the *ad litem* a state actor for the purpose of § 1983.  And Hall does not make even these general assertions in the complaint.  The federal-law claims must be dismissed based on immunity and because the complaint does not allege

76

state action by the *ad litem* defendants.

The *ad litem* defendants' motion to dismiss the state-law claims is based on the statutory immunity provided by TEX. FAM. CODE § 107.009.[15]  The statute provides:

> (a) A guardian ad litem, an attorney ad litem, or an amicus attorney appointed under this chapter is not liable for civil damages arising from an action taken, a recommendation made, or an opinion given in the capacity of guardian ad litem, attorney ad litem, or amicus attorney.
>
> (b) Subsection (a) does not apply to an action taken, a recommendation made, or an opinion given:
>
> (1) with conscious indifference or reckless disregard to the safety of another;
>
> (2) in bad faith or with malice; or
>
> (3) that is grossly negligent[16] or wilfully wrongful.

Under the statute, guardians and attorneys *ad litem* are immune from damages for actions taken in their *ad litem* capacity unless those actions fall into one of the statutory exceptions.  *Zeifman v. Nowlin*, — S.W.3d —, 2010 WL 3370522, at *2 (Tex.  App.—Austin 2010).  Hall does not dispute

---

[15]   It is not clear whether the *ad litem* defendants' arguments for derived judicial immunity extend to the state-law claims.  By providing a specific immunity statute for attorneys and guardians *ad litem*, the Texas legislature appears to have foreclosed derived judicial immunity for these parties for state law claims.  It is not necessary to decide that question, however, because statutory immunity requires dismissal of the state-law claims.

[16]   Section 107.009 does not provide a definition of gross negligence.  The Civil Practice and Remedies Code does:
>    "Gross negligence" means an act or omission:
>
>    (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
>    (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE § 41.001(11).

that the *ad litem* defendants acted in their *ad litem* capacities or that their appointment qualifies them for protection under § 107.009.  She must plead a legal basis for applying one of the three exceptions.  Her pleadings fail to do so.[17]

The state-law claims against Child Advocates and Sanchez are for violations of J.C.P.'s statutory right to a safe foster home and for negligence.  Before considering their arguments, it is worth noting that Hall's only response to their motion, which was filed eight months ago, was to request discovery on qualified immunity.  (Docket Entry No. 80).  The defendants indicated that they would provide certain documents to Hall at the February hearing.  (Docket Entry No. 89, pp. 53–58).  Hall has filed nothing else concerning the motion.

Count XVII is a claim for negligence in the performance of the guardian *ad litem* duties.  The statute requires gross negligence or more for liability.  Count XI, which alleges failure to ensure a safe environment for J.C.P., fails because it does not create a duty for guardians *ad litem*.  It provides

> In making a placement decision for a child under two years of age, *the department* shall:
>
> (1) ensure that the child is placed with a person who will provide a safe and emotionally stable environment for the child; and
> (2) give priority to a person who will be able to provide care for the child without disruption until the child is returned to the child's parents or the department makes a permanent placement for the child.

TEX. FAM. CODE § 264.1071 (emphasis added).  It appears that no court has interpreted this provision.  As the italicized text shows, the plain language creates a duty for the department only.  Hall cannot maintain a claim under this provision against the *ad litem* defendants.

---

[17]   To the extent the *ad litem* defendants ask this court to consider submissions beyond the pleadings, such as affidavits, this court declines to do so.  *See Tremont LLC*, 696 F. Supp. 2d at 852–53 (requiring conversion of a Rule 12(b)(6) motion to a motion for summary judgment to consider documents attached to the motion). To the extent the *ad litem* defendants, particularly Rhodes, rely on affidavit evidence in support of the motion to dismiss, this court has not considered that evidence.

The amended complaint against Rhodes includes allegations that he breached the mediated settlement agreement by not immediately seeking to have J.C.P. admitted to HealthBridge and that he violated his statutory duty and common-law duties to represent J.C.P. by failing to interview Hall and other family members about J.C.P.'s condition, by failing to obtain first-hand information about Cochran and the substitute caregivers, and by failing to ensure that J.C.P. was in a properly screened and supervised home, as required by TEX. FAM. CODE § 264.106(b) and TEX. HUM. RES. CODE § 42.042.  The amended complaint also alleges that Rhodes breached his fiduciary duty by putting his own financial interests above the best interests of the child.

Texas specifies by statute the types of interviews an attorney *ad litem* must conduct to learn information about the child he is representing:

> An attorney ad litem appointed to represent a child or an amicus attorney appointed to assist the court:
>
> (1) shall:
>
> (A) subject to Rules 4.02, 4.03, and 4.04, Texas Disciplinary Rules of Professional Conduct, and within a reasonable time after the appointment, interview:
>
> (i) the child in a developmentally appropriate manner, if the child is four years of age or older;
>
> (ii) each person who has significant knowledge of the child's history and condition, including any foster parent of the child; and
>
> (iii) the parties to the suit;
>
> . . .
>
> (F) participate in the conduct of the litigation to the same extent as an attorney for a party[.]

TEX. FAM. CODE § 107.003(1).

As Rhodes points out, the allegations in the complaint are consistent with him relying on the

guardians *ad litem* to conduct the interviews. Rhodes has not argued that this practice is consistent with his duty under § 107.003. Assuming, without deciding, that a strict reading of the statute sets the standard of care, he could be negligent *per se* for failing to comply with the statute. *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1989) ("Negligence *per se* is a tort concept whereby a legislatively imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonably prudent person."). *But see id.* ("It is well-established that the mere fact that the Legislature adopts a criminal statute does not mean this court must accept it as a standard for civil liability."). Negligence is not enough to overcome immunity. Guardians *ad litem* are "appointed to represent the best interests of a child," TEX. FAM. CODE § 107.001(5), and are themselves required to gather the same information as the attorneys *ad litem*. *Compare id.* § 107.002(b) *with id.* § 107.003(1). An attorney *ad litem*'s decision to rely on information gathered by the guardian *ad litem* is not by itself grossly negligent. The allegations in the complaint do not defeat Rhodes's immunity.

The amended complaint alleges that Rhodes failed to conduct a sufficient inquiry into the capability of the substitute caregivers does not as a matter of law state a claim for relief. Hall alleges that one substitute caregiver was not a licensed nurse and was a convicted drug user. (Docket Entry No. 111, ¶ 13). But that caregiver was not alleged to have anything to do with J.C.P.'s death. *Cf. TXI Transp. Co.*, 306 S.W.3d at 240–41 (explaining proximate cause for failure-to-screen claims). The amended complaint also alleges that a substitute caregiver who was present when J.C.P.'s tracheostomy tube detached was "legally blind" and that this "fact could explain" why the caregiver did not notice the detachment. (Docket Entry No. 111, ¶ 14). The amended complaint refers as the basis for this allegation to an affidavit from Patsi Minschew, who claims to have known Cochran for forty years. (*Id.*, Ex. F, ¶ 2). In the affidavit, Minschew states that the caregiver is

80

"legally blind," meaning that, "[w]ithout her contacts she cannot see." (*Id.*, ¶ 5).  This affidavit does not support the allegations in the complaint.  *See* 5A CHARLES ALAN WRIGHT *ET AL.*, FEDERAL PRACTICE AND PROCEDURE § 1327 (3d ed.) ("It appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.") (citing cases).  There is no basis to infer that a better investigation would have done more than reveal that a caregiver needed contact lenses to see.  There is no allegation that the caregiver routinely went without the contact lenses or that a more thorough investigation would have uncovered that fact.  The complaint fails to allege causation.

Hall's allegation that a more thorough investigation by Rhodes would have shown that J.C.P.'s  burns were accidental does not provide a basis for her claims.  The circumstances of an accidental scalding of a helpless baby, including the failure to check the temperature and the failure to remove the baby from the water promptly, resulting in burns severe enough to require hospitalization, may well justify initiating proceedings to remove the baby from the mother's custody.  *See* TEX. FAM. CODE 161.001(1)(E) (allowing a court to terminate the parent-child relationship when the parent has "engaged in conduct . . . which endangers the physical . . . well-being of the child").  The circumstances of the burning, even as an accident, showed a danger to the child.

Hall's allegation of a breach of fiduciary duty by the *ad litems* is also insufficient as a matter of law.  The amended complaint alleges:

> Defendant made regular political contributions to Judge Michael Schneider in an effort to secure juvenile court appointments in a longstanding, common practice of Harris County juvenile courts. . . . Further, Defendant is compensated from the Harris County general fund and, on information and belief, such compensation is based on

> the amount of time expended on a particular case. . . .  Therefore, J.C.P.'s interest in swiftly moving out of the foster care system into a permanent placement is diametrically opposed to Defendant's natural self interest in being compensated as much as possible with the least amount of effort.

(Docket Entry No. 111, ¶ 22).  "An attorney breaches his fiduciary duty when he benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends." *Murphy v. Gruber*, 241 S.W.3d 689, 693 (Tex. App.—Dallas 2007); *see also Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001).  The complaint is, however, devoid of any claims that Rhodes slowed the process to bill more time.  To the contrary, the complaint alleges that Rhodes and others acted too fast in removing J.C.P. from Hall's custody.  The fact of hourly compensation is not enough to allege a breach of fiduciary duty, but that is all Hall has alleged.

The complaint also alleges that although J.C.P.'s doctor indicated that she would need surgery as early as April 15, 2009, Rhodes did not investigate why the procedure had not taken place by the summer.  (Docket Entry No. 111, ¶ 12).  Hall does not allege, however, any basis to conclude that the procedure could have taken place earlier or that the delay in any way contributed to cause the child's death.

Hall's breach of contract claim fails as well.  Hall accuses Rhodes of breaching the contract by calling J.C.P.'s doctor to testify that it would be unsafe for J.C.P. to be hospitalized unnecessarily, violating the terms of the mediated settlement agreement.  The complaint states that the claim is "[a]sserted by Hall against H. Rhodes."[18]  An attorney *ad litem* is "an attorney who

---

[18]   By contrast, other claims are "[a]sserted by Hall, as next friend of J.C.P., against H. Rhodes."

provides legal services to a person, including a child, and who owes to the person the duties of undivided loyalty, confidentiality, and competent representation." TEX. FAM. CODE § 107.001(2). Under Texas law, the duties are owed to the child, not the parent. The Texas Court of Appeals in Austin recently reached this conclusion when analyzing the statutory definition of an amicus attorney, who is "an attorney appointed by the court in a suit, other than a suit filed by a governmental entity, whose role is to provide legal services necessary to assist the court in protecting a child's best interests rather than to provide legal services to the child." *Id.* § 107.001(1). The court held that the language meant that the "amicus attorney owes a duty of competent representation to the trial court, not to the parents. *Zeifman v. Nowlin*, — S.W.3d —, 2010 WL 3370522, at *3 (Tex. App.—Austin 2010). The same result applies here. Moreover, she has not alleged any facts that suggest the breach would defeat immunity. Rhodes suggests argues that his breach, if any, was to protect J.C.P. from the risk of infection that would occur in a hospital when J.C.P.'s doctor testified that there was no need for J.C.P. to be hospitalized. Without crediting his version of events, it is enough to concluded that his account is consistent with the allegations in the complaint. When allegations are consistent with illegal and legal conduct, the complaint fails to state a claim for relief. *Twombly*, 550 U.S. at 556 (noting that an allegation of "lawful parallel conduct fails to bespeak unlawful agreement").

The claims against the *ad litem* defendants are dismissed.

### E.    The Motions Filed By Harris County and Harris County CPS

Harris County and Harris County CPS have moved for dismissal under Rules 12(b)(1) and 12(b)(6). Harris County CPS seeks dismissal based on state sovereign immunity. As noted above, § 1983 does not apply to states or to state agencies. Whether an agency is an arm of the state, and therefore immune from suit under the Eleventh Amendment depends on the following factors:

(1) whether the state statutes and case law characterize the agency as an arm of the state;

(2) the source of funds for the entity;

(3) the degree of local autonomy the entity enjoys;

(4) whether the entity is concerned primarily with local, as opposed to statewide, problems;

(5) whether the entity has authority to sue and be sued in its own name;

(6) whether the entity has the right to hold and use property.

*Delahoussaye v. City of New Iberia*, 937 F.2d 144, 147 (5th Cir. 1991) (citing *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 131 (5th Cir. 1986).  The Fifth Circuit has applied these factors and held that Harris County CPS is an arm of the state under the Eleventh Amendment and § 1983.  *Stem v. Ahearn*, 908 F.2d 1, 4–5 (5th Cir. 1990).  Hall has not indicated any change relevant to these factors that would justify a different decision today.  The claims against Harris County CPS are dismissed for lack of jurisdiction based on sovereign immunity.

The claims against Harris County are based on its alleged failure to provide sufficient funding to the attorney *ad litem* program.  (Docket Entry No. 22, ¶ 59).  Hall alleges that this failure results in the inability of *ad litem* attorneys to provide effective assistance of counsel, as guaranteed by the United States Constitution, and to an adequate tribunal.  If a municipality's policy is not in itself unconstitutional, the policymaker must have been deliberately indifferent to the risk that the policy would result in constitutional deprivations.  The complaint is far too conclusory to allege deliberate indifference in the adoption of a policy of inadequate funding that was the moving force in denying Hall and J.C.P. their constitutional rights.  The complaint alleges that in Harris County, the "number of attorney ad litems appointed to represent children in foster care in Harris County is

well below the number necessary to provide for manageable attorney caseloads"; the funding provided by Harris County "was wholly inadequate to financially provide for the number of attorneys actually needed to effectively represent [J.C.P.] and other children in foster care"; and the County undermines the quality of representation through hourly compensation, which gives attorneys an incentive to move cases slowly instead of promptly resolving them. (Docket Entry No. 22, ¶¶ 58–60). Hall alleges that as a result, attorneys are "routinely unable or unwilling to interview witnesses, including the parents of the children subject to the proceedings, or review the required medical reports submitted to the judge at each hearing and are unable or unwilling to provide effective and adequate counsel and zealous representation." (*Id.*, ¶ 61). Assuming these allegations to be true, there is no allegation that suggests that the Harris County policymakers were aware of the problems and decided to do nothing about them. *See Valle*, 610 F.3d at 542.

This court has also considered the attachments to the amended complaint. *See Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017 (5th Cir. 1996). There are two newspaper articles on the *ad litem* appointment process. (Docket Entry No. 22, Ex. D). The first is about a juvenile court judge's practice of hiring attorneys *ad litem* to assist in speeding adoptions; there is no indication of deficient performance by the attorneys or problems in the quality of the representation of the children. The second refers to several Harris County judges who repeatedly appoint the same group of lawyers, often campaign donors, to represent children. The article quotes a "Democratic activist and criminal attorney" who surmises that the judges wanted to retain their "pet stable of lawyers, who tended to value their relationships with the court as much as their defense of clients." This statement does not identify any specific problems in the representation of children that resulted. Neither article would support or supply an allegation that any county policymaker was aware of any pattern of rights violations as a result of the allegedly inadequate funding of attorneys and guardians

*ad litem* to represent children.

Hall also asserts state-law claims for a breach of the statutory duty to provide adequate representation for children.   The statute reads:

> In a suit filed by a governmental entity requesting termination of the parent-child relationship or to be named conservator of a child, the court shall appoint an attorney ad litem to represent the interests of the child immediately after the filing, but before the full adversary hearing, to ensure adequate representation of the child.

TEX. FAM. CODE § 107.012.  The parties have not cited, and this court has not found, any case interpreting this provision.  But Hall presents no basis to conclude that there is a private right of action for a violation of this statute.

The claims against Harris County are dismissed.

## IV.   Conclusion and Remaining Issues

### A.   The Remaining Claims and Parties

This court has granted summary judgment as to all claims asserted against TDFPS and its employees, James, Dixon, Clay, Halsey, Lasco, Smith and Donatto.  The claims are dismissed with prejudice.

This court has dismissed all claims against the following parties under Rule 12:  Chief Justice Jefferson, Justice O'Neill, Harris County, Harris County CPS, Rhodes, Child Advocates, Sanchez, Lutheran Social Services, Memorial Hermann, and Community Health Choice.

### B.   Remand Under 28 U.S.C. § 1367(c), Repleading, and Status Conference

This court has dismissed all the federal law claims asserted by Hall.  Once a district court has "dismissed all claims over which it has original jurisdiction," it may remand the case to state court.  28 U.S.C. 1367(c)(3); *Batiste v. Island Records, Inc.*, 179 F.3d 217, 226–27 (5th Cir. 1999).  Whether to retain jurisdiction is within the court's discretion.  *Brown v. Sw. Bell Tel. Co.*, 901 F.2d

1250, 1254 (5th Cir. 1990).  A court is "guided by the statutory factors set forth in § 1367(c) as well as the common law factors of judicial economy, convenience, fairness, and comity."  *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).  Judicial economy weighs in favor of retaining jurisdiction if the court has invested "a significant amount of judicial resources in the litigation" as measured by, among others, the length of time the litigation has been pending in federal court, the volume of record produced, the number of motions filed and considered, the completion of discovery, and the proximity of trial.  *See id.* at 602–03 (collecting cases); *see also Mendoza v. Murphy*, 532 F.3d 342, 347 (5th Cir. 2008) (considering the trial court's "substantial familiarity with the merits of the case" and that the claims were fully developed and ripe to hold that the district court did not abuse its discretion in retaining jurisdiction over state claims (quoting *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 587 (5th Cir. 1992)).

This case has been pending for in this court for thirteen months.  The parties have filed, and this court has decided, a number of motions.  The facts and legal theories underlying the state and the federal claims are intertwined or closely related.  As a result, it has been most efficient for this court to consider the challenges to the pleading and record as to both the federal and state claims up to this point.  But having dismissed the federal law claims, this court must determine whether to retain the remaining state-law claims or remand to the state court.

An important factor is whether there is any basis for Hall to amend her federal law claims against any of the remaining defendants.  Any such amendment must be consistent with this Memorandum and Opinion and Rule 11 of the Federal Rules of Civil Procedure, and must not be futile.

One factor favoring remand is that the case contains at least two Texas statutes that have not

87

been interpreted by state courts, including TEX. FAM. CODE § 107.012 and TEX. CIV. PRAC. & REM. CODE § 281.0656(c).  *See* 28 U.S.C. § 1367(c) (allowing dismissal when a claim "raises a novel or complex issue of state law").

This court requests briefs of no more than 20 pages from Hall by **October 20, 2010**, stating whether she seeks leave to amend any of the federal-law claims against the remaining defendants and, if not, whether remand is appropriate.  The defendants may respond no later than **November 10, 2010**.  At the **November 12, 2010** status conference, these issues will be addressed.

SIGNED on September 30, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge